## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 14-150 (KM) |
| **v.** | **MEMORANDUM and ORDER** |
| **Wayne DUNICH-KOLB,** **Defendant.** | (Competency) |

Counsel for the defendant, Wayne Dunich-Kolb, has moved under 18 U.S.C. § 4241 for an order declaring the defendant mentally incompetent to stand trial in this criminal case. (ECF no. 29) For the reasons stated herein, the motion will be denied.

### I.    Procedural Background

On March 24, 2014, a federal grand jury indicted Mr. Dunich-Kolb on federal tax charges. The currently operative Superseding Indictment (ECF no. 27) has ten counts. Counts 1–7 charge Dunich-Kolb with preparing false and fraudulent returns on behalf of his clients, in violation of 26 U.S.C. § 7206(2). Those counts allege that Dunich-Kolb caused his clients to form fictitious partnerships and S corporations, and fabricated losses and deductions in relation to those fictitious businesses. Counts 8–10 charge Dunich-Kolb with filing false tax returns that understated his own income for tax years 2006, 2007, and 2008, in violation of 26 U.S.C. § 7206(1).

On July 15, 2016, defense counsel filed with the Court a report of Dr. Gerard Figurelli, a psychologist. ("Figurelli Rpt.") At a status conference on August 24, 2016, counsel stated that his client was not mentally competent to stand trial. I ordered a second evaluation, and, on the government's application, I appointed Dr. Steven S. Simring, M.D., a psychiatrist, to perform it. Dr. Simring's conclusions are contained in a report dated November 29,

2016. ("Simring Rpt.") On December 21, 2016, defense counsel filed a formal notice of motion for a competency hearing pursuant to 18 U.S.C. § 4241(a). (ECF no. 29) I granted the defense time to obtain a supplemental evaluation by Dr. Figurelli, which is contained in a Supplemental Report ("Figurelli Supp. Rpt."). Defendant's counsel, Jeffrey G. Garrigan, Esq., submitted a Certification ("Garrigan Cert."), describing his own dealings with Mr. Dunich-Kolb.

On February 24, 2017, the Court convened an evidentiary hearing to determine the defendant's mental competency. Dr. Figurelli and Dr. Simring both testified. They were the only witnesses; the defendant did not testify. Exhibits, including the three expert reports and the Garrigan certification, were received in evidence.[1] I invited the parties to submit post-hearing briefing, and both sides did so. (ECF nos. 33, 34) The matter is now poised for decision.

## II.   Legal Standards

The parties fundamentally agree as to the applicable legal standards. The basic due process guarantee of a fair criminal trial requires that a defendant possess the capacity (1) to understand the nature and object of the

---

[1]     The exhibits, all admitted on consent, are:

CH-1   *Curriculum vitae* of Steven S. Simring, M.D., M.P.H.

CH-2   Simring Expert Testimony Case List

CH-3   Simring Rpt.

CH-4   *Curriculm vitae* of Dr. Figurelli

CH-5   Figurelli Rpt.

CH-6   Figurelli Supp. Rpt.

CH-7   Certification of Jeffrey G. Garrigan, Esq.

CH-8   Excerpt from DSM-5, "Personality Disorders"

CH-9   Excerpt from DSM-5, "Schizophrenia Spectrum and Other Psychotic Disorders"

Neither party seems to have ordered the transcript of the hearing. In writing this opinion, I worked from my notes.

proceedings, and (2) to assist counsel in his[2] defense. *See United States v. Renfroe,* 825 F.2d 763, 765 (3d Cir. 1975). That two-pronged standard is well established, having been stated by the Supreme Court in *Dusky v. United States,* 362 U.S. 402 (1960) (requiring that (1) the defendant have a rational and factual understanding of the proceedings, and (2) a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"), and *Drope v. Missouri,* 420 U.S. 162, 171 (1975). *See also Taylor v. Horn,* 504 F.3d 416, 430 (3d Cir. 2007) (citing *Dusky*).

Congress codified a similar version of that standard in the Insanity Defense Reform Act of 1984, which provides:

> If, after the [competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is [1] unable to understand the nature and consequences of the proceedings against him or [2] to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d) ([bracketed] numbers added). *See* Insanity Defense Reform Act of 1984, Sen. R. No. 98–225, at 236 (1983), *reprinted in* 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418 ("This test of competency, in essence, adopts the standards set forth by the Supreme Court in *Dusky v. United States.*").

The Government bears the burden of proving competency. *See United States v. Velasquez,* 885 F.2d 1076, 1089 (3d Cir. 1989), *cert. denied,* 494 U.S. 1017 (1990). A court evaluating a defendant's competency may consider such factors as "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *United States v. Leggett,* 162 F.3d 237, 244 (3d Cir. 1998) (quoting *Drope v. Missouri,* 420 U.S. 162, 180 (1975)). The court may also consider defense counsel's representations about his client's competency. *Renfroe,* 825 F.2d at 767.

---

[2]     Because the defendant in this case happens to be male, I will for convenience use male pronouns even when referring to a generic defendant.

As to competency the presiding judge is the fact finder, and must weigh conflicting evidence:

> When presented with competing expert reports, as is the case here, the district court judge, who is in the best position to evaluate credibility of experts, is permitted to assign greater weight to some opinions over others, or altogether reject certain expert opinions. *See, e.g., United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (stating that "[a] district court may rely on one of two competing competency opinions given by qualified experts"); *United States v. Mahoney*, 717 F.3d 257, 264–66 (1st Cir. 2013) (holding that the district court did not err by relying on the testimony of one expert and its own observations rather than on the testimony of another expert); *United States v. VanHoesen*, 450 F. App'x 57, 60–61 (2d Cir. 2011) (holding that district court did not err in attributing more weight to the expert reports finding that defendant was competent, even where a forensic psychologist found defendant to be incompetent).

*United States v. Brown*, No. 12-0367, 2015 WL 1573365 at *12 (E.D. Pa. Apr. 8, 2015).

Competency is not a stringent standard, however. "[I]t does not follow that because a person is mentally ill [that person] is not competent to stand trial." *United States v. Leggett,* 162 F.3d 237, 244 (3d Cir. 1998) (internal quotation marks omitted). *See also United States v. Nichols*, 56 F.3d 403, 412 (2d Cir. 1995) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial."); *id.* at 412-13 (finding that evidence of paranoid delusions and onset of psychosis did not undermine district court's finding of competency); *United States v. Wolfson*, 616 F. Supp. 2d 398 (S.D.N.Y. 2008) (defendant diagnosed with a Bipolar I disorder, manic episodes, delusional thinking, with paranoid and perhaps grandiose delusions nevertheless found competent to stand trial).

An assessment of a defendant's competence, then, "has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). A defendant's ability to assist properly in his defense requires only that he possess a

4

"sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Dusky*, 362 U.S. at 402). "If the mental illness does not deprive the defendant of the ability . . . to understand the proceedings . . . rationally as well as factually, then the illness is irrelevant for the purposes of determining competency." *Leggett*, 162 F.3d at 244 (internal quotation marks and citations omitted).

### III.   Diagnostic Standards: DSM-5 Criteria

Both experts draw on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, known as "DSM-5." Dr. Figurelli rendered a diagnosis of Delusional Disorder, Paranoid/Persecutory Type, 297.1 (F22). (*See* Excerpt from DSM-5, Ex. CH-9.) Dr. Simring diagnosed Mr. Dunich-Kolb with F60.9 Unspecified personality disorder. (*See* Excerpt from DSM-5, Ex. CH-8). For convenience I reprint the relevant diagnostic criteria here.

#### A.   Delusional Disorder

The DSM-5 Diagnostic criteria for Dr. Figurelli's diagnosis, Delusional Disorder, Paranoid/Persecutory Type, 297.1 (F22), are as follows:

A.   The presence of one (or more) delusions with a duration of 1 month or longer.

B.   Criterion A for schizophrenia has never been met.

**Note**: Hallucinations, if present, are not prominent and are related to the delusional theme (e.g., the sensation of being infested with insects associated with delusions of infestation).

C.   Apart from the impact of the delusion(s) or its ramifications, functioning is not markedly impaired, and behavior is not obviously bizarre or odd.

D.   If manic or major depressive episodes have occurred, these have been brief relative to the duration of the delusional periods.

E.  The disturbance is not attributable to the physiological effects of a substance or another medical condition and is not better explained by another mental disorder, such as body dysmorphic disorder or obsessive-compulsive disorder.

*Specify whether:*

**Erotomanic** type: ....

**Grandiose** type: ....

**Jealous** type: ....

**Somatic** type: ....

**Persecutory** type: This subtype applies when the central theme of the delusion involves the individual's belief that he or she is being conspired against, cheated, spied on, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals.

**Mixed** type: ....

**Unspecified** type: ....

*Specify if:*

**With bizarre content**: Delusions are deemed bizarre if they are clearly implausible, not understandable, and not derived from ordinary life experiences (e.g., an individual's belief that a stranger has removed his or her internal organs and replaced them with someone else's organs without leaving any wounds or scars).

*Specify if:*

[Criteria for classification of episodes as acute, current, or in remission, as well as criteria for assessing severity] ....

(Ex. CH-9 at 90–91)

**B.  Unspecified Personality Disorder**

The DSM-5 diagnostic criteria for Dr. Simring's diagnosis, Unspecified Personality Disorder, must be understood in the context of the umbrella category, General Personality Disorder. The General Personality Disorder criteria are as follows:

A.  An enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's

6

culture. This pattern is manifested in two (or more) of the following areas:

    1.   Cognition (i.e., ways of perceiving and interpreting self, other people, and events).

    2.   Affectivity (i.e., the range, intensity, lability, and appropriateness of emotional response).

    3.   Interpersonal functioning.

    4.   Impulse control.

B.   The enduring pattern is inflexible and pervasive across a broad range of personal and social situations.

C.   The enduring pattern leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D.   The pattern is stable and of long duration, and its onset can be traced back at least to adolescence or early adulthood.

E.   The enduring pattern is not better explained as a manifestation or consequence of another mental disorder.

F.   The enduring pattern is not attributable to the physiological effects of a substance (e.g., a drug of abuse, a medication) or another medical condition (e.g., head trauma).

(Ex. CH-9 at 646–47)

With those general criteria established, DMS-5 then defines a number of particular personality disorders, the last of which is Unspecified Personality Disorder, 301.9:

This category applies to presentations in which symptoms characteristic of a personality disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the personality disorders diagnostic class. The unspecified personality disorder category is used in situations in which the clinician chooses *not* to specify the reasons that the criteria are not met for a specific personality disorder, and includes presentations in which there is insufficient information to make a more specific diagnosis.

(Ex. CH-9 at 684)

7

## IV.   Discussion and Findings

### A.   The Experts' Ultimate Conclusions

The experts' opinions as to the ultimate issue of competency are directly opposed. Their diagnoses, too, are disparate.

Dr. Figurelli rendered a diagnosis of Delusional Disorder, Paranoid/Persecutory Type, 297.1 (F22). Here is his ultimate opinion:

> It is the opinion of this examiner, stated within a reasonable degree [of] psychological certainty, that [Mr. Dunich-Kolb] is suffering from a type of psychotic disorder—Delusional Disorder, Paranoid Type—that renders it highly doubtful that he possess the ability: 1) to consult with his attorney with even a reasonable degree of rational understanding; 2) to understand, factually or rationally, the nature and consequences of the legal proceedings conducted against him; 3) to testify adequately in his own defense; and/or 4) to assist adequately in his own defense in the course of these proceedings.

(Ex. CH-5 at 9)

Dr. Simring rendered a diagnosis of Unspecified Personality Disorder F60.9. Here is his ultimate opinion:

> It is my opinion, to a reasonable degree of medical probability, that Wayne A. Dunich-Kolb does not have a mental disease or defect rendering him mentally incompetent to stand trial. It is my opinion, to a reasonable degree of medical probability, that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. It is my conclusion that he is mentally fit to proceed to trial.

(Ex. CH-3 at 8)

### B.   The Experts' Reports and Testimony

Both Dr. Figurelli and Dr. Simring are well qualified to give opinion testimony. As to relevant experience and credentials I would give the edge to Dr. Simring.

8

Dr. Figurelli, who possesses a PhD, has been a licensed psychologist since 1992. (Ex. CH-4) He is board certified in psychopharmacology, is a licensed clinical alcohol and drug counselor, and has undergone additional training at the Academy of Applied and Clinical Psychoanalysis. He has qualified as an expert and has testified hundreds of times. Those matters have for the most part been in family and civil court.

Dr. Simring is an M.D. specializing in psychiatry, and also possesses a Master's degree in public health obtained in 1974. (Ex. CH-1) He is board certified in psychiatry and forensic psychiatry. From 2005 to the present he has been Associate Clinical Professor of Psychiatry at the Columbia College of Physicians and Surgeons, and from 2005–10 he was Director of the Columbia/Cornell Residency Program in Psychiatry and Law. A list of 37 cases in which he testified as an expert from 2012–16 includes twelve matters that were criminal cases and/or involved competency determinations. (Ex. CH-2) It was my overall view that Dr. Simring had a superior understanding of the issue of legal competency, the criminal process, and the manner in which psychological categories interact with legal ones.

I start with areas of broad agreement between these two experts. As to the defendant's relevant history and background, they seem to be in general agreement.

Mr. Dunich-Kolb, now 52 years old, was raised in Hudson and Bergen Counties. His father was a CPA, and his mother a hairdresser. Neither expert found any history of substance abuse, psychiatric hospitalization, or serious health problems. A 2009 marriage was annulled after four months. Two other relationships appear also to have been short-lived; one ended in a complaint of domestic violence, later dropped, and the other may have been a casualty of his legal difficulties.

Mr. Dunich-Kolb obtained a bachelor's degree in accounting from Syracuse University in 1988, and went on to receive further training in

personal financial and tax planning. After a period of employment with accounting firms, in 1995 he went into business for himself. His practice consisted of, *inter alia,* tax planning and tax return preparation for individuals.

The Indictment refers to a 1996 consent order that is relevant. I take judicial notice of that consent order, dated May 23, 1996, entered into between Mr. Dunich-Kolb and the State of New Jersey Department of Law and Public Safety, Division of Consumer Affairs, State Board of Accountancy. *See* http://njpublicsafety.com/ca/action/19960523_KOLB.pdf. The order recites that Mr. Dunich-Kolb has been practicing as an accountant without a license, bars him from holding himself out to the public as an accountant in the future, and imposes a $5000 fine.[3]

An investigation by the taxing authorities seems to have begun as long ago as 2007. In March 2012, Mr. Dunich-Kolb was arrested on New Jersey state charges related to his business. On September 14, 2012, he pled guilty to one count of theft and illegal retention of funds. The underlying conduct involved depositing into his own controlled accounts certain checks of his clients. Those checks, made payable to various state and federal authorities, totaled about $190,000. On December 7, 2012, he was sentenced to four years' imprisonment. After an initial period of incarceration, he was released to a halfway house. It was while he was at the halfway house, on March 24, 2015, that Mr. Dunich-Kolb was arrested on the current federal charges.

The only psychological testing was performed by Dr. Figurelli. The Beck DI, Beck AI, and PAI tests were negative for depression and anxiety. The PAI results indicated unwillingness to recognize personal shortcomings, lack of awareness of his own distress, and lack of insight or understanding into his own psychological condition. Dr. Simring did not quarrel with those results,

---

[3]   In both reports, the facts about Mr. Dunich-Kolb's backgrounds are largely self-reported. Dr. Simring's report describes the defendant as a CPA; Dr. Figurelli's report does not.

although he did not regard them as supporting a diagnosis of a psychotic disorder.[4] Neither expert believed that Mr. Dunich-Kolb was malingering.

Both experts concluded that Mr. Dunich-Kolb was above average in intelligence and able to focus. He was able to, and did, intellectually grasp the basics of the criminal charges and a criminal trial. He understood what he was accused of, the role of the prosecutor, defense attorney, and judge, the consequences of conviction, and so on. The two experts differed, however, as to whether Mr. Dunich-Kolb's understanding of the case was a rational one, and especially whether his psychological state interfered with his ability to assist in his defense.

As Dr. Figurelli sees it, Mr. Dunich-Kolb is in thrall to a rigid, inflexible and delusional belief, the subject matter of which is confined to his criminal case. Dunich-Kolb believes he has been illegally targeted by an IRS criminal investigation headed by Special Agent Jonathan Helmstetter. The reason for the investigation, he thinks, is that SA Helmstetter has a personal vendetta against him, and is jealous of his material success and expensive home. Mr. Dunich-Kolb stated that he was being followed, and that SA Helmstetter was talking to family members, screening his mail, and so on. By showing a badge and gun, he said, Helmstetter was able to intimidate people into cooperating. The IRS, Dunich-Kolb believes, is "snooping" on private citizens without justification (he referred to news accounts regarding ACORN and the Tea Party). These paranoid beliefs, says Dr. Figurelli, preoccupy Dunich-Kolb and interfere with his rational appreciation of the case and ability to cooperate in his defense.

---

[4]     Dr. Simring's report states incorrectly that Dr. Figurelli had noted "behavioral and personality features consistent with antisocial personality disorder, psychopathy and/or sociopath[y]." At the hearing, Dr. Simring acknowledged that he had misread a passage in Dr. Figurelli's report that was referring generically to what the tests measure, not to any result specific to Mr. Dunich-Kolb. (The report has a one and a half page generic description of the tests, followed by a paragraph actually stating the results of the tests as to Dunich-Kolb.) The error was careless. If anything, however, it caused Dr. Simring to overstate the severity of the psychological test results.

Asked to explain the "vendetta," Mr. Dunich-Kolb stated that he has been "ugly" and "didn't play nice." (Cross-examination of Dr. Figurelli suggested that this may have been a reference to the defendant's dealings with the authorities during the investigation of the State case, but this was not entirely clear from the report.) Dunich-Kolb hazarded more general observations, such as "East hates West; rich hate poor; country hates city." He referred to reports of a political candidate's use of a private email server or a prominent quarterback's tax planning strategies, suggesting that he, Dunich-Kolb, was singled out for prosecution when those celebrities were not. His use of partnerships, he said, was just a "loophole" similar to those used by famous people, including the President.

Mr. Dunich-Kolb reviewed some of the emails and other evidence with Dr. Figurelli, and provided innocent explanations. He expressed disbelief that there could be any accusation of criminal wrongdoing when the clients had not been audited. He blamed his prior attorney for talking him into pleading guilty in the prior, State criminal case; the prior attorney, he said, had predicted that he would get a probationary sentence and not face further charges. Dunich-Kolb vehemently insisted that he would not make that mistake again, and that he had now hired an attorney who would fight the charges.

Dr. Figurelli believed that between his initial evaluation on April 8, 2016, and his supplemental evaluation in January 2017, some deterioration had taken place. Mr. Dunich-Kolb's mood was more labile, his thoughts less goal-directed, and his statements less focused and relevant.

Dr. Figurelli considered statements of Mr. Dunich-Kolb's counsel, Jeffrey G. Garrigan, Esq., which he found to be consistent with his own diagnosis. Mr. Garrigan's certification states that he met regularly with Mr. Dunich-Kolb to discuss the documents produced in discovery. He found that Dunich-Kolb, instead of focusing on the task at hand, kept returning to the themes of the Helmstetter vendetta and the fact that the clients had not been audited. He regularly supplied Garrigan with news clipping suggesting corruption in the

12

IRS. Dunich-Kolb expressed the opinion that Helmstetter had destroyed exculpatory documents that were among those seized from his home. In meetings with the government, Dunich-Kolb apparently tried to stare down Helmstetter, and showed little interest in the government's presentation of evidence. Among the government's documents were pictures of his home, which he took as confirmation of his theory that the investigating agent was jealous of his prosperity. (*See* Ex. CH-7.)

Dr. Figurelli dispelled the lay assumption that a belief must be bizarre, or involve voices and visions, to be delusional.[5] He noted that "Mr. Dunich-Kolb has expressed and maintained the belief that he has not committed any wrongdoing even when presented with evidence that purports to support the contrary, and when confronted with the nine count federal indictment brought against him." (CH-6 at 7) That belief, and the accompanying vendetta theory, says Dr. Figurelli, represent a "psychotic break from reality." *Id.*

Dr. Figurelli was asked to state why he had found a psychotic disorder, rather than a personality disorder. An important distinction, he answered, is that a delusion may be quite specific, whereas a personality disorder follows a person through life and interferes with life activities. Dunich-Kolb, however, did not have a history of psychological or psychiatric problems. His illogical beliefs seemingly cropped up in connection with the State criminal case in 2012 and remain tied to the IRS and the tax investigation.

---

[5]    Both experts quoted the following definition of a delusion:

A false belief based on incorrect inferences about external reality that is firmly held despite what almost everyone believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary. The belief is not ordinarily accepted by members of the person's culture or subculture (i.e., it is not an article of faith). When a false belief involves a value judgment, it is regarded as a delusion only when the judgment is so extreme as to defy credibility.

Dr. Simring's report, without a specific citation, states that this language appears in DSM-5. It is not within the DSM-5 excerpts supplied to the court, and I believe that it may actually derive from DSM-4.

On cross-examination, Dr. Figurelli acknowledged that many of Mr. Dunich-Kolb's beliefs had a basis in reality. He *was* being followed by SA Helmstetter, who *was* zealously attempting to make a case against him. His family members and clients *were* being interviewed. Belief that federal agents may have instituted a mail cover is not irrational. The notion that he was being "tag-teamed" is not irrational, in that the state and federal authorities had indeed cooperated and charged him *seriatim*. The idea that the government was "fishing" in his bank accounts, too, is not irrational, given the government's subpoena power. Dr. Figurelli seemed to acknowledge that it is rational to feel resentment when one perceives that famous people get breaks not available to others. Denial of criminal intent, or the invocation of "loopholes," is not irrational in a tax case, where specific intent is central. Unwillingness to repeat the "mistake" of pleading guilty—which had once led to a jail term—is not irrational.

Dr. Simring's interview of Mr. Dunich-Kolb yielded many of the same themes. The defendant had a sophisticated understanding of the charges and trial proceedings. He had no history of psychiatric disorders or treatment. He spoke logically and coherently. With anger and sarcasm, he insisted that SA Helmstetter was going to extraordinary lengths to convict him, out of envy or some other motive. He referred to a 25-person arrest team and federal/state cooperation, seemingly as an example of overkill. The charges, he said, were "garbage."

Simring and Dunich-Kolb went over text messages and emails that the government had identified as evidence. Dunich-Kolb seemed to be familiar with them. He provided credible innocent explanations and pointed out ambiguities in the words he used. None of the messages, he said, proved him guilty of any crime.

Mr. Dunich-Kolb's beliefs are not, in Dr. Simring's estimation, psychotic or delusional. Whether correct or not, they bear a plausible relation to external reality; even if wrong, they are explanations that fit the known facts. "At most,

14

[Dunich-Kolb] believes that the government has been overzealous in its prosecution, and has misinterpreted ambiguous evidence against him." (CH-3 at 7) To be sure, he shows some obsessive and paranoid traits; he is angry; he is oppositional and stubborn. But none of this comes near a psychotic break with reality, in Dr. Simring's view.

For all these reasons, Dr. Simring found that at most a personality disorder was at work. He added, moreover, that the ultimate issue of a precise diagnosis was not strictly germane; irrespective of the label attached to Mr. Dunich-Kolb, Dr. Simring opined that he was able to assist in his own defense.

On cross-examination, Dr. Simring admitted that Mr. Dunich-Kolb was "dug in" to his beliefs and probably would not alter them in response to evidence. He characterized this as difficulty or stubbornness. He admitted that these particular beliefs were confined to the facts of the criminal case, an important factor in Dr. Figurelli's analysis. He saw signs, however—particularly, the lack of a long term marriage or other relationship—that a personality disorder had affected other parts of Mr. Dunich-Kolb's life.

### C.   Analysis: The Defendant's Ability to Rationally Understand the Proceedings and Assist in His Own Defense

There is no disagreement that Mr. Dunich-Kolb intellectually grasps the nature and significance of the criminal charges and these proceedings. Rather, the experts differ as to whether the defendant has a *rational* understanding of the proceedings, and especially whether he has paranoid delusions that prevent him from assisting in his own defense.

I do not think it is necessary to posit psychosis in order to explain Mr. Dunich-Kolb's attitudes. In "Key Features that Define the Psychotic Disorders: Delusions," DSM-5 gives the following example of a nonbizarre delusion: "the belief that one is under surveillance by the police, despite a lack of convincing

evidence."[6] (Ex. CH-9 at 87) I accept Dr. Simring's observation that Mr. Dunich-Kolb's beliefs, whether one agrees with them or not, are reality-based. It is true that SA Helmstetter carries a gun and has interviewed the defendant's associates and clients. It is true (colorful "tag-team" verbiage aside) that the state and federal authorities jointly investigated him. It is not irrational to think that the federal government has the power to screen mail or subpoena bank records. Nor need one be unhinged to think that celebrities and other powerful people may deploy their considerable resources to avoid the consequences of their actions. The comment about East hating West is not some inscrutable word salad.[7] In short, this is not the proverbial *pro se* litigant who may be working out his psychological problems by bringing serial, meritless lawsuits against imagined oppressors. Mr. Dunich-Kolb is reacting to the government's very real pursuit of him.

Applying the test of experience, I do not find Mr Dunich-Kolb's beliefs to be outside the mainstream of what I see in criminal cases. It is common for criminal defendants, especially those accused of white collar, specific-intent crimes,[8] to insist upon their innocent mental state, which cannot be directly disproven. So-called tax protestors, in particular, cling to implausible factual and legal theories despite repeated failures in court. This may simply be a case of rationalization, or so-called "motivated reasoning," a cognitive strategy that can cause us to cling stubbornly to beliefs despite contrary evidence.[9] Common

---

6     I take that to mean "convincing evidence" that one is being followed, not "convincing evidence" of criminality.

7     I did not find it enigmatic in the least. I took it as a verbal shrug, an expression of the adage that haters are going to hate. Mr. Dunich-Kolb seemed to appreciate the lack of a logical basis for SA Helmstetter to have a vendetta against him. He attributed the irrationality not to himself but to the agent, who was indulging baser emotions.

8     *See Cheek v. United States*, 498 U.S. 192 (1991) (good-faith misunderstanding of the law negates required mental state of willfulness required for certain tax offenses).

9     Consider that the accused confronts opposed pairs of beliefs. Those on one side of the divide entail that he is an honest person, that he is entitled to keep his wealth, and that he should not be convicted of a crime or go to jail; those on the other side,

human experience suggests that an accused will often attribute base motives to the investigators. That unverifiable accusation is a convenient means of deflecting blame. Here, moreover, the defendant has been investigated for many years and has already served a prison term; his extreme dislike and distrust of law enforcement is not hard to explain.

So psychosis is far from a necessary hypothesis. Is it nevertheless the correct one? I am convinced that the answer is no, because I found Dr. Simring's analysis to be more credible, persuasive, and consonant with the applicable legal standard.

The experts' diagnoses diverged, but I remain focused on the issue here, which is factual in nature and not purely diagnostic. DSM-5 was designed to help professionals categorize psychiatric conditions as part of their healing mission. But to say that a psychiatric condition—whatever it is—exists or might be treated is different from saying that a defendant falls below the rather minimal standard of competency. Within broad limits, the court must take defendants as it finds them. *See Leggett,* 162 F.3d at 244 (a mentally ill person may nevertheless be competent to stand trial); *Nichols,* 56 F.3d at 412-13 (paranoid delusions and onset of psychosis not inconsistent with a finding of competency); *Wolfson,* 616 F. Supp. 2d at 402–17 (defendant diagnosed with a Bipolar I disorder, manic episodes, delusional thinking, with paranoid and perhaps grandiose delusions, nevertheless found competent).

Dr. Simring, as one might expect from his credentials and experience, showed a superior sensitivity to the ultimate issue of competency within the framework of the criminal process. It is not psychotic to deny culpable intent, even in the face of overwhelming evidence; criminal defendants do it all the time. It does not bespeak a psychotic break with reality, as Dr. Figurelli seems to suggest, to fly in the face of a multi-count indictment. (*See* Figurelli Supp. Rpt. at 7) An indictment is an accusation, which no one is bound to accept as

the opposite. If this is motivated reasoning, the motivation is not hard to find. And to a greater or lesser degree, we are all susceptible to such thinking.

fact. Indeed, the reasonable-doubt standard itself permits and sometimes requires us to reach results that are at odds with the weight of the evidence.

Defense counsel acknowledges that Mr. Dunich-Kolb reviewed thousands of pages of discovery documents; he found, however, that his client filibustered on the "vendetta" theory, making it impossible to discuss the documents specifically. Both Dr. Simring and Dr. Figurelli, however, were able to break the filibuster. Both reviewed with the defendant a large volume of emails and other evidence amassed by the government. Both experts' reports state that Mr. Dunich-Kolb was able to discuss those documents lucidly and to proffer innocent explanations for them. Dr. Simring, in particular, stated that Mr. Dunich-Kolb "was able . . . to offer plausible explanations of his behavior. He was able to deal with the major evidence against him, such as texts and email, and to offer alternative exculpatory explanations." (Simring Rpt. 6–7)

As Dr. Simring points out, the defendant is stubborn and opinionated, and those attitudes seem to have hardened over the course of his dealings with the criminal justice system. The facts suggest to me that Mr. Dunich-Kolb is embittered by his prior conviction and sentence, and that his no-holds-barred resistance to the current charges is shaped by that experience. Having been convinced to plead guilty by advice that he would receive a probationary sentence, he never again will admit wrongdoing, even as to the old charges. (*See* Figurelli Supp. Rpt. at 4) Given that defiant stance, it is easier to understand Mr. Dunich-Kolb's unwillingness to concede anything, even a minimal level of good faith on the part of the investigators.

A "delusion," DSM-5 teaches, is not so easily distinguished from a strongly held belief. That must be especially true where the belief is a value judgment or opinion that can be rebutted but not refuted factually. I accept Dr. Simring's conclusion that Mr. Dunich-Kolb's beliefs are based on his rational perception of actual, existing facts. We might say that the defendant overvalues his own opinions and is rigid about them. We might say that he is overly confident about his assessment of the internal motives of others. (SA

18

Helmstetter's actions, for example, might just as easily be chalked up to conscientiousness, rather than *resentiment*.) Many a criminal defendant has overestimated his own persuasiveness or the viability of his defenses. I do not know enough about the evidence to say whether Mr. Dunich-Kolb has done that here. What I can say is that Mr. Dunich-Kolb has not so parted company with reality that he is unable to rationally understand the proceedings or cooperate in his defense.

I consider a key factor in the divergence between Dr. Figurelli's diagnosis and that of Dr. Simring. A personality disorder, says Dr. Figurelli, is an abiding trait that remains in place and affects broad areas of a person's life; a psychotic delusion, by contrast, may be context-specific (whether nonbizarre, such as "my spouse is cheating on me," or bizarre, such as "the government is broadcasting thoughts into my head."). To a large degree, it is because Mr. Dunich-Kolb's extreme beliefs are specifically tied to SA Helmstetter and the IRS that Dr. Figurelli considers them to be psychotic delusions, rather than manifestations of a personality disorder.

I remain unconvinced. Indeed, cross-examination of Dr. Simring suggested that to the extent Mr. Dunich-Kolb's thoughts and attitudes do not resemble a personality disorder, it may be because they do not even rise to that level. Understandably, the tax investigation and the prior conviction have dominated Mr. Dunich-Kolb's thoughts for at least five years, and probably longer. I find it plausible that any relevant personality trait was always present, but then fastened on the criminal case that now dominates his life, and has found its most acute expression there. The state conviction and sentence, as well as the continuing tax investigation and new federal charges, just upped the ante. With SA Helmstetter dogging his steps, Mr. Dunich-Kolb's suspiciousness, intransigence, and inability to acknowledge shortcomings now have something specific to attach themselves to. Dr. Simring opined that such traits might well have affected other areas of Mr. Dunich-Kolb's life, citing in particular his four-month marriage and two other short-lived relationships. But

19

if the manifestations were not previously so dramatic before, it may simply be that less was at stake.

I am also mindful that great caution is required when the "delusion" in question is a belief *about the merits of the criminal case itself*. A defendant cannot be deemed delusional merely because his legal strategy appears unwise or self-defeating. Many "persons of unquestioned competence have espoused ludicrous legal positions." *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003). The case law carries a strong implication that the competency standard is, and must be, merits-neutral. *See Godinez v. Moran*, 509 U.S. 389, 399 (1993) ("Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not …."); *Taylor v. Horn*, 504 F.3d 416, 435 (3d Cir. 2007) ("As the District Court aptly observed: 'Taylor's lucid and remorseful desire to plead guilty simply cannot, out of hand, be colored as utterly bizarre behavior indicative of incompetency.'"); *United States v. Whittington*, 586 F.3d 613, 619 (8th Cir. 2009) (approving district court's reasoning that a defendant should not be regarded as irrational because he exercised his constitutional right to go to trial, even if an expert witness thought he had not provided "effective" or "good" answers to the charges). Dr. Simring rightly stresses that a finding of competency does not require us to agree or disagree with the defendant that the evidence fails to incriminate him.

To that, I add that a court may be doing a defendant no favor by pathologizing his refusal to accept the government's interpretation of the evidence. Even to entertain such a notion risks coercion of a guilty plea or, more generally, enlistment of psychiatry into the service of the state, a dangerous proposition. If a defendant is found incompetent, the next step is not release, but commitment to the custody of the Attorney General for treatment until he attains competency.[10] *See* 18 U.S.C. § 4241(d); *United States*

---

[10]     Defendant's own expert says that his prognosis is "poor."

*v. Moruzin,* No. CRIM 05-306 (JBS), 2010 WL 2817191, at \*2 (D.N.J. July 15, 2010). Assume, then, that we define mental incompetency in terms of the defendant's failure to appreciate the strength of the prosecution's case. Does it follow that, to demonstrate that he has attained competency, a defendant must inculpate himself? Clearly the answer must be no, but the defense expert's definition of incompetency here may be a first step down that road. Many a defendant might come to rue accepting the paternal "help" represented by too high a threshold of competency. The price may be erosion of the defendant's constitutional rights and personal autonomy.

The threshold of competency is relatively low; indeed, the statute, 18 U.S.C. § 4241(d), seems to be pitched at the minimum required by the Supreme Court case law. *See* pp. 2–5, *supra.* Thus it is not surprising that the government is able to cite cases in which defendants who displayed overt psychotic symptoms were nevertheless found competent to stand trial. Although no case could be entirely on point, the cited cases are persuasive here.

For example, in *United States v. Brown,* 669 F.3d 10 (1st Cir. 2012), the court considered a defendant whose attitudes toward the criminal justice system were not only distrustful but highly idiosyncratic:

> The [defendant] . . . made a significant number of comments that reflected his atypical legal beliefs and overall distrust of the legal system. Viewed in context, these words and behaviors (though often bizarre) did not evidence confusion on [the defendant's] part about the legal proceedings against him, but rather reflected firmly held, idiosyncratic political beliefs punctuated with a suspicion of the judiciary. Moreover, while some of these beliefs reflected a misunderstanding of the law (namely that the district court did not have jurisdiction over him and that it was a commercial court) they do not render [the defendant] incompetent to stand trial. . . . In fact, [defendant's] contention that courts have no authority over him is not a new one for federal judges. . . . As we have previously stated, "[s]ometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side but in neither event

> do they imply mental instability or concrete intellect . . . so
> deficient that trial is impossible."

*Id.* at 18–19 (internal citations omitted). There, even a defendant who believed that the court itself was part of a lawless conspiracy to convict him was found competent.

*United States v. Gowadia,* No. CR. 05-00486 SOM, 2010 WL 234829 (D. Haw. Jan. 21, 2010) (affirming Report & Recommendation of Magistrate Judge), involved a defendant's abiding distrust of his lawyers. The lawyers, he said, did not understand his legal theories, "had received a classified briefing from a Government agent," and might be "accepting everything the Government tells them." *Id.* at *22. The government's expert credibly diagnosed the defendant with narcissistic personality disorder. Such inability to trust one's lawyer would logically bear a direct relation to the ability to assist in one's defense. The *Gowadia* court held, however, that although attorney-client relations would surely be "difficult," the defendant had the ability to consult with and assist his counsel. *Id.* at *24.

As *Gowadia* suggests, representation of a client with such strong views surely poses challenges. Mr. Garrigan, in his certification, has catalogued some of those challenges. But "disagreement with one's attorney does not make one mentally unable to consult with him." *United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010). Likewise, strategic differences, stubbornness, or refusal to admit guilt despite persuasive evidence, are not considered signs of unfitness to stand trial. The proper inquiry is not whether the defendant is *unwilling* to assist as counsel would wish, but whether he is "unable" to assist. *See United States v. Vachon*, 869 F.2d 653, 655 (1st Cir. 1989); *see also United States v. Moruzin*, No. CRIM 05-306 (JBS), 2010 WL 2817191, at *22 (D.N.J. July 15, 2010) (Simandle, C.J.) ("Whether [the defendant] chooses to assist his counsel . . . is a choice he must make, and he will face the consequences of that choice."). The Court's finding that the defendant possesses the necessary capacity to understand and assist does not guarantee that the defendant "will

22

act in conformity with such understanding and ability." *Id.* at *4 (citing *Bell v. Evatt*, 72 F.3d 421, 432 (4th Cir. 1995)).

Compare our case, in which the defendant appears to trust and cooperate with his counsel. The alleged inability to assist counsel consists in his obsession with SA Helmstetter, which, counsel says, eats up the time they have together and impairs any focused review of the evidence. I regard this situation as being one step removed from, and an order of magnitude less serious than, the situation found *not* sufficient to support a finding of incompetency in, *e.g., Gowadia.*

In sum, I find the opinion and testimony of Dr. Simring to be the more credible. I accept that the defendant may suffer from a personality disorder, and may even have fixed and inflexible beliefs about the bona fides of the investigating agent. I do not propose, however, to bandy diagnoses with the experts any further. I find factually, based on all the evidence, that Mr. Dunich-Kolb's condition, however described, does not rise to the level of a mental disease or defect that prevents him from understanding the nature and consequences of the proceedings against him or assisting properly in his defense.

## ORDER

Accordingly, IT IS this 27th day of March, 2017

ORDERED that the motion (ECF no. 29) under 18 U.S.C. § 4241 for an order declaring the defendant mentally incompetent to stand trial in this criminal case is DENIED.

KEVIN MCNULTY
United States District Judge