## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**WAYNE DUNICH-KOLB,**<br>　　　　　　　　　**Defendant.** | Crim. No. 14-150 (KM)<br><br>**OPINION and ORDER** |

On January 11, 2019, the defendant, Wayne Dunich-Kolb, pled guilty to charges involving false tax returns, mail fraud, and identity theft. On September 17, 2019, this Court varied downward significantly from the Guidelines range of 87–102 months, and sentenced him to a total term of 72 months' imprisonment. Of that 72-month term, he has served a little over 31 months; his projected release date, assuming continued accrual of good time, is May 13, 2023. Mr. Dunich-Kolb is serving his sentence at the satellite camp facility which is part of USP-Canaan, located in Waymart, Pennsylvania.

Now before the Court is Mr. Dunich-Kolb's motion for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). As grounds, he cites his obesity as a risk factor in connection with infection from COVID-19, as well as the need to care for his aged and ailing mother. Mr. Dunich-Kolb originally filed his motion *pro se*. (DE 108) I ordered the government to file a response within seven days (DE 109), and it did so (DE 110). Thereafter, however, the Federal Public Defender filed an appearance (DE 112), and then sought a further extension of time to obtain records in support of the motion, which I granted on consent (DE 113). The Public Defender then filed a second version of the motion for compassionate release (DE 114; as redacted, DE 115), to which the government filed a second response (DE 116).

All deadlines, as extended, are past, and the matter is fully briefed. The government does not appear to dispute that Mr. Dunich-Kolb has exhausted administrative remedies as required. (*See* Letter to Warden dated March 31, 2020. (DE 108 at 5))[1] I therefore proceed to the merits. For the reasons stated herein, the motion for compassionate release is denied. Also denied is an alternative application for transfer to home confinement, pursuant to 18 U.S.C. § 3624(c).

## A. Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)

### 1. Statute and Guidelines

Absent statutory authorization, a federal district court is not empowered to revise or otherwise administer a previously-imposed sentence of imprisonment. *See Dillon v. United States*, 560 U.S. 817, 824, 130 S. Ct. 2683, 2690 (2010). Under 18 U.S.C. § 3582(c)(1)(A), however, the district court is granted limited authority to reduce a term of imprisonment, provided certain requirements are met:

> The compassionate-release provision states that a district court "may reduce [a federal inmate's] term of imprisonment" and "impose a term of probation or supervised release ... if it finds that ... extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). [fn. 5 omitted] But before granting compassionate release, a district court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." Id. § 3582(c)(1)(A). [fn. 6: "The sentencing reduction must also be 'consistent with applicable policy statements issued by the Sentencing Commission.' 18 U.S.C. § 3582(c)(1)(A)."] Those factors include, among other things, "the history and characteristics of the defendant," 18 U.S.C. §

---

[1]     The power to seek an order of compassionate release motion under section 3582(c)(1)(A) is lodged in the first instance with the Bureau of Prisons. Only after the BOP has denied the defendant's application, or after a period of 30 days has elapsed without a decision by the BOP, can the defendant directly file a motion in court. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia,* 954 F.3d 594, 597 (3d Cir. Apr. 2, 2020) (denying remand of appeal seeking compassionate release as futile in light of lack of exhaustion); *United States v. Epstein,* Crim. No. 14-287, 2020 WL 1808616, at *4 (D.N.J. Apr. 9, 2020) (Wolfson, C.J.) (citing cases).

> 3553(a)(1), and "the need for the sentence imposed ... to reflect the
> seriousness of the offense, to promote respect for the law, ... to
> provide just punishment for the offense[, and] ... to afford adequate
> deterrence to criminal conduct," id. § 3553(a)(2)(A)–(B).

*United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).

The relevant Sentencing Guidelines policy statement, U.S.S.G. § 1B1.13, parallels the requirement of "extraordinary and compelling reasons," and also requires that the defendant not present a danger to the safety of any other person or the community, within the meaning of the Bail Reform Act, 18 U.S.C. § 3142(g).

*Pawlowski* reviewed a district court ruling under a deferential abuse-of-discretion standard and is factually distinct from this case, and therefore does not compel a result here. It does, however, provide a template for analysis. *Pawlowski* upheld the denial of a COVID-based motion for compassionate release under the following circumstances:

> [The petitioner] suffers from several health conditions, including
> hypertensive heart disease, chronic obstructive pulmonary disease
> (COPD), dyspnea (shortness of breath), sleep apnea, and has only
> one lung as a result of a pulmonectomy. He argued that these
> conditions place him at a higher risk of serious illness and death
> from COVID-19 should he contract that disease. He further
> explained that the facility at which he is currently incarcerated, the
> Federal Correctional Institution at Danbury, Connecticut ("FCI
> Danbury"), has been particularly affected by COVID-19. Indeed, as
> of June 19, 2020, 98 inmates had tested positive for the virus, one
> of whom had died and 91 of whom had recovered. *See* COVID-19
> Cases, Federal Bureau of Prisons (last accessed June 19, 2020),
> https://www.bop.gov/coronavirus/. Additionally, 61 staff
> members at FCI Danbury had tested positive, of whom none had
> died and 60 had recovered. *See id.*
>
> The District Court denied the motion. It explained that while
> Pawlowski's conditions placed him at increased risk should he
> contract COVID-19, the sentencing factors set out at 18 U.S.C. §
> 3553(a)—particularly, the need to reflect the seriousness of the
> offense, promote respect for the law, provide just punishment, and

afford adequate deterrence—did not weigh in favor of release, as he had served just 19 months of a 180-month sentence.

*Id.* at 328–29 (fns. omitted); *see also United States v. Doe*, __ F. App'x __, 2020 WL 6328203, at *1 (3d Cir. Oct. 29, 2020) (upholding denial of application, despite undisputed multiple medical conditions that would place defendant at risk, based on finding that the risk of infection at institution was speculative, and § 3553(e) factors weighed against release).

In Sections A.2, and A.3, *infra*, I consider the "extraordinary and compelling reasons" proffered by the defendant, namely his obesity and the need to care for his mother. In Section A.4, I consider the remaining "factors set forth in [18 U.S.C. § 3553(a)]," 18 U.S.C. § 3582(c)(1)(A), as well as the Bail Reform Act.

**2. Obesity and conditions at USP-Canaan**

Mr. Dunich-Kolb argues that he should be released because a medical condition, obesity, renders him particularly vulnerable to COVID-19 under the conditions that obtain at USP-Canaan.

I dispense with any lengthy introduction to the COVID-19 pandemic. The COVID-19 virus can be transmitted even by persons who display no symptoms.

- The virus is thought to spread mainly from person-to-person.
    - Between people who are in close contact with one another (within about 6 feet).
    - Through respiratory droplets produced when an infected person coughs, sneezes or talks.

Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited November 2, 2020). To thwart the spread of the illness, the Centers for Disease Control and Prevention ("CDC") recommend social distancing (staying at least six feet away from others), wearing cloth face coverings when around others, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other

practices. *Id.* The potential for transmission in an institutional setting, such as a prison, is readily apparent, and has been the subject of much guidance. *See, e.g.,* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus2019ncov/community/correction-detention/guidance:correction-detention.html (last visited November 2, 2020). There are modes of treatment, and most of those infected recover. Sadly, however, many do not; the death toll in the United States alone well exceeds 230,000, and currently there is no date for development of a vaccine or cure.

I first consider the risk of infection at USP-Canaan. BOP has implemented safety procedures to reduce the risk of transmission. BOP Action Plan, https://www.bop.gov/coronavirus/covid19_status.jsp (Oct. 9, 2020 update). These include limits on visitation, limited social distancing (facilities permitting), intake and quarantining procedures, testing, limits on movement of prisoners, screening of staff and visitors, and so on. *Id.; see also United States v. Cummings*, No. 4:17-CR-00228, 2020 WL 4607253, at *2 (M.D. Pa. Aug. 11, 2020) (noting lack of active infections at USP-Canaan, and observing that "as a general matter, USP Canaan has 'respond[ed] to and defend[ed] against the threats of the virus in a vigorous and generally effective manner.'").

It is true, of course, that it is impractical to enforce strict social distancing in a prison camp. Still, generalities about COVID-19 running rampant in the prison system, and the like, do not suffice to establish that *this* prisoner, in *this* prison, faces extraordinary circumstances. On that score, *Doe* is pertinent:

> Doe argues that COVID-19 is "out of control throughout the [Bureau of Prisons]," and he relies on the number of COVID-19 cases in federal prisons generally as well as anecdotal reports of FCI Cumberland staff taking what he deems inadequate precautions in July 2020. The District Court, however, reasoned that FCI Cumberland had reported only two cases of COVID-19 at the time of its ruling and that Doe's fear that he might contract COVID-19 was largely speculative. Doe has raised nothing calling

11

those conclusions into question. *Cf. United States v. Raia*, 954 F.3d
594, 597 (3d Cir. 2020)

*United States v. Doe*, 2020 WL 6328203, at *2.

As I have remarked in earlier opinions, where a risk to human life and
health is concerned, we do not give A's for effort. Preventive measures are
important, but results, too, are important. I therefore consider the infection
statistics at USP-Canaan in particular.

USP-Canaan has not been identified as the site of an outbreak. *See*
Section B, *infra*. Indeed, it appears to rank fairly low among BOP facilities in
terms of positive COVID-19 tests.[2] Its high-security prison facility houses
approximately 1041 inmates, and the satellite camp facility, where Mr. Dunich-
Kolb is located, houses approximately 64 inmates, for a total of 1205. (The
rated capacity of the institution is 1599.)[3] The most recent COVID figures for
USP-Canaan, which do not distinguish between the prison and camp facilities,
are as follows.

### COVID-19 Inmate Test Information [USP-Canaan]

| Completed tests | Pending Tests | Positive tests |
| --- | --- | --- |
| 336 | 1 | 10 |

These figures do not seem to bespeak comprehensive testing of all inmates, and
the extent to which they may reflect multiple tests on a single person is not
clear—both major caveats. As a percentage of tests performed, positive tests
stand at 2.9%; as a percentage of the total inmate population, .9%.

### COVID-19 Cases [USP-Canaan]

| Inmates positive | Staff positive | Inmate deaths | Staff deaths | Inmates recovered | Staff recovered |
| --- | --- | --- | --- | --- | --- |
| 5 | 1 | 0 | 0 | 2 | 4 |

---

[2]     https://www.bop.gov/coronavirus/ (sortable by column heading).

[3]     USP-Canaan, https://www.bop.gov/locations/institutions/caa/; District of
Columbia Corrections Council Inspection Report (Jan. 7, 2016),
https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/USP%20
Canaan%20Inspection%20Report%20FINAL%201.7.16.pdf.

11

As a percentage of the total inmate population, inmates positive for COVID-19 stand at .45%, and deaths at 0%.[4]

It is instructive to compare the testing and infection rates at USP-Canaan with those outside. For example, in New Jersey (Mr. Dunich-Kolb's home state, to which he seeks to be released), total cases represent approximately 2.6%, and reported deaths approximately .18%, of the State's population of 9.2 million.[5] I am cognizant that if released, Mr. Dunich-Kolb could, with sufficient discipline, socially isolate in a manner that is not practical while in the prison

_____

[4]    The source for this testing and COVID-19 data is the BOP website. https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases&text=Currently%2C%2014%2C980%20inmates%20and%201%2C297,occurred%20while%20on%20home%20confinement (last visited Nov. 2, 2020). The testing figures are accompanied by a disclaimer that not all tests are reported nationwide, and that a single inmate may have been tested more than once. The government's responding submission reports that, as of August 24, 2020, the number of reported cases stood at 4. (DE 116 at 2).

[5]    The State's most recent official daily report contains the following figures:

Total Cases 239,629

Total Confirmed Deaths 14,561

Total Probable Deaths 1,793

Total PCR Tests Reported 4,656,106

State of New Jersey, COVID-19 Information Hub, https://covid19.nj.gov/forms/datadashboard (last visited Nov. 1, 2020). Any calculation of percentages, of course, is subject to major caveats, including the assumption that reports are for unique individuals, and not multiple reports of the same individual. Common sense suggests that testing totals, in particular, may include multiple tests on the same individual. The larger point, however, is that there is no convincing proof that Mr. Dunich-Kolb faces a significantly greater risk of infection while at the USP-Canaan prison camp.

I add that Mr. Dunich-Kolb ordinarily resides in, and seeks to be released to, Bergen County, New Jersey, which has one of the highest infection rates in the State. Most recently Bergen County reported 161 new positive cases, a cumulative figure of 1820 confirmed and 243 probable deaths, and 25,626 positive test results. *Id.* The population of Bergen County was approximately 905,000 as of the 2010 Census. QuickFacts, Bergen County, NJ, https://www.census.gov/quickfacts/bergencountynewjersey.

camp. Still, there is no compelling showing that release is required to mitigate the risk of infection.

In short, the risk of infection at USP-Canaan is real, but not particularly high when considered in the context of this pandemic. Such evidence does not rise above the level of a generalized concern about the possibility of infection, and is not sufficient to support a finding of extraordinary circumstances at USP-Canaan. *See generally United States v. Raia,* 954 F.3d 594, 597 (3d Cir. 2020).

I move on to consider whether Mr. Dunich-Kolb's medical condition nevertheless sets forth "extraordinary and compelling circumstances" requiring that he be released. The Guidelines application note to § 1B1.13, *supra,* includes examples of medical conditions considered "extraordinary and compelling," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). More generally, it provides that such a condition would be satisfied by a defendant who is

(I)   suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.,* cmt. n.1(A)(ii).

I do not regard the examples as exclusive, however, and I consider all the relevant circumstances. We are not in the pre-COVID, pre-First Step Act era, when compassionate release was largely concerned with end-of-life care. In combination with a petitioner's particular susceptibility, COVID-19 might

11

dictate a finding that a medical situation is extraordinary, even if it would not have been so absent the pandemic.[6]

Mr. Dunich-Kolb acknowledges that he is generally in good health, but asserts that he has a medical condition, obesity, which renders him particularly vulnerable to serious harm should he become infected with COVID-19. The CDC have identified groups of individuals who are at "increased risk for severe illness" from COVID-19. Here is the latest guidance from the CDC on body mass as a risk factor:

> Having obesity, defined as a body mass index (BMI) between 30 kg/m2 and <40 kg/m2 or severe obesity (BMI of 40 kg/m2 or above), increases your risk of severe illness from COVID-19. Having overweight, defined as a BMI > 25 kg/m2 but less than 30 kg/m2 might increase your risk of severe illness from COVID-19.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited November 2, 2020).

Medical records from the BOP state that as of February 5, 2020, Mr. Dunich-Kolb stood 73 inches tall and weighed 210 pounds. According to the CDC's online BMI calculator, those figures yield a body mass index ("BMI") of 27.7.[7] That is in the overweight (25–30), but not obese (> 30), range. A BMI in

---

[6]     I thus assume *arguendo* that the Guidelines and commentary do not rigidly constrain what may be considered extraordinary and compelling, although ultimately I will deny relief here. I therefore need not weigh in on the vexed question of the significance of the Sentencing Commission's failure, as of yet, to amend the Guidelines to reflect the passage of the First Step Act. (The Commission currently has a number of vacancies. https://www.ussc.gov/about/who-we-are/organization.) The competing views are essentially that (a) the First Step Act, while eliminating the role of the BOP as gatekeeper for compassionate release, left prior standards intact; and (b) that the Act's authorization of such a motion by the prisoner implies some broadening of the permissible grounds for relief. *See, e.g., United States v. Jones*, No. 94-CR-20079-EJD-1, 2020 WL 5359636, at *4 (N.D. Cal. Aug. 27, 2020); *United States v. Adeyemi*, No. CR 06-124, 2020 WL 3642478, at *15 (E.D. Pa. July 6, 2020); *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019).

[7]     For consistency, I have used the online BMI calculator provided by the CDC. https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculato r/bmi_calculator.html. Mr. Dunich-Kolb's counsel states that he self-reports a BMI of 29.6. The government's papers calculate a BMI of 28.5. Those discrepancies are not

the overweight range, according to the CDC, "might" present an increased risk.[8]

Mr. Dunich-Kolb, then, has a condition, short of obesity, that does not certainly, but "might," place him at risk for a more severe reaction if infected with COVID-19. Even actual obesity, not accompanied by other risk factors (such as advanced age or COPD), has regularly been rejected as grounds for compassionate release. For example, in *United States v. Cherry*, Crim. No. 09-715, 2020 WL 5868800, at *2 (D.N.J. Oct. 2, 2020), the court denied relief where, although the prisoner had a BMI in the low-obese range of 30 to 33, there was no evidence of other health problems, inability to lose weight, inadequate health care, or diminished ability to provide self-care. So too here. *See also United States v. Gore*, Crim. No. 10-250, 2020 WL 3962269, at *3–5 (D.N.J. July 13, 2020) (finding that defendant's obesity, asthma, and other factors did not constitute "extraordinary and compelling reasons that would justify his compassionate release," where the facility was providing adequate care); *United States v. Wax*, Crim. No. 14-251, 2020 WL 3468219, at *3 (D.N.J. June 25, 2020) (denying defendant's motion for compassionate release for lack of an extraordinary and compelling reason, even though he suffered from hypertension and obesity, with a BMI of 36, because he was receiving "regular and consistent medical care"); *United States v. Falci*, Crim. No. 17-228, 2020 WL 3410914, at *1, *4 (D.N.J. June 22, 2020) (denying motion for compassionate release where defendant was 60 years old and suffered from obesity, hypertension, and other health issues); *United States v. Bleicher*, Crim. No. 19-99, 2020 WL 2744606, at *3 (D.N.J. May 27, 2020) (denying

---

significant to my analysis. All indicate that he is in the overweight range, short of obesity.

[8]    I point out, although the parties do not, that Mr. Dunich-Kolb is approximately 56 years of age. In adults, the risk of serious illness, measured in hospitalization per 100,000 population, increases with each decade of age. For those 40-49, the rate is 84.6; for those 50–64, 136.1; for those 85 and above, 513.2. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. These appear to be overall figures, not correlated to any comorbidities.

compassionate release for a defendant with a BMI of 37.7); *United States v. Alexander*, Crim. No. 19-32, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying compassionate release where defendant suffered from hypertension and obesity but medical records showed that Bureau of Prisons was "adequately managing [his] medical care").

Considering all the facts, I find that Mr. Dunich-Kolb's health condition, in the context of conditions at USP-Canaan, does not rise to the level of "extraordinary and compelling" circumstances.

### 3. Need to care for family member

Mr. Dunich Kolb's second claim of "extraordinary and compelling" circumstances arises from his stated need to care for his elderly mother. It is not disputed that her condition is such that she requires very significant assistance.[9]

I consider first whether such a claim is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As noted above, I accept *arguendo* that the Guidelines and commentary, while relevant, do not rigidly constrain the Court's discretion to recognize circumstances that are extraordinary and compelling. *See* n.6, *supra*.

Under the applicable Sentencing Guidelines, certain family circumstances may qualify as "extraordinary and compelling reasons." The closest fit is application note 1(C) to Sentencing Guidelines § 1B1.13:

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

U.S.S.G. § 1B1.13, cmt. n.1(C).

---

[9] In a letter, her physician discloses her age and states that she suffers from medical conditions which, for privacy reasons, will not be repeated here. He opines that "[w]ithout [Mr. Dunich-Kolb's] help, her health will deteriorate." (DE 114-2 at 2).

Mr. Dunich-Kolb's situation—involving care of a parent, as opposed to a child or incapacitated spouse—does not precisely match the ones enumerated in the Guideline or policy statements. But it does bear, if I may put it that way, a family resemblance, and I will consider it.[10] In doing so, I must consider whether these particular circumstances are extraordinary and compelling in their own right.

A compassionate release application must seek more than just a second bite at issues properly considered at sentencing. And to some degree, I have already considered this issue; at sentencing, Mr. Dunich-Kolb pressed the need to care for his elderly parents[11] as a factor in mitigation of sentence. I did not find those circumstances sufficient to warrant a downward departure (Sentencing Tr. 99),[12] although I did consider them in mitigation. They were brought to the Court's attention by counsel (Sentencing Tr. 114) and indeed by Mr. Dunich-Kolb's mother, who addressed the court directly (*id.* 138–39).

Mr. Dunich-Kolb's mother has a number of chronic conditions; she is not hospitalized, but does concededly require significant care. The question becomes whether the unavailability of Mr. Dunich-Kolb to provide such care

---

[10]    *See* n.6, *supra.*

[11]    Mr. Dunich-Kolb's father passed away in March 2020. (DE 114-2 at 2).

[12]

> The first is -- I will only discuss briefly, is a departure for family responsibilities. I do recognize the caretaker function that Mr. Dunich-Kolb is fulfilling, but there are other relatives available. I don't see this as being different in kind or unusual with regard to other cases that I see. Look, it's always a hardship on the family when a person is incarcerated. But recognizing that in the proper case I do have the discretion and the legal ability to make such a departure, I will not exercise my discretion to do so.

(Sentencing Tr. 99).

Sentencing, because it presented a number of preliminary Guidelines issues requiring an evidentiary hearing and rulings by the Court, occurred over the space of two days. The two volumes of the sentencing transcript, filed at DE 101 and 111, are paginated consecutively.

rises to the level of extraordinary and compelling circumstances. I conclude that it does not.

Dunich-Kolb has two adult siblings. A brother, in particular, is available. The brother has submitted a letter stating that, in light of his family responsibilities and status as an "essential" Verizon employee, he is too busy to help. (DE 114-2 at 4). No doubt it would be an inconvenience to take over some of the caretaker responsibilities, assuming that he is not doing so already. It is not uncommon, however, for a criminal sentence to impose burdens, sometimes severe ones, on family members. The motion is silent as to who has been filling the role of caretaker since Mr. Dunich-Kolb was first incarcerated in March 2018. No facts are proffered regarding efforts to hire or arrange for alternative care, whether at home or elsewhere.

No case, whether favorable or unfavorable to Mr. Dunich-Kolb's position, is likely to be completely on point. Moreover, comparisons between cases granting and denying relief are to some degree confounded by the courts' divergent views as to the continuing binding effect of the Guidelines and commentary after the passage of the First Step Act. *See* n. 6, *supra.* But those views do not diverge as much as might be assumed. Typically, even courts taking the strict view will assume *arguendo* that care of parents might be grounds for relief, but deny the application on the merits; conversely, even courts taking the broader view acknowledge that the grounds must be generally consistent with, if not precisely dictated by, the Guidelines and commentary as written. One common thread, whether relief is granted or denied, is the requirement that the prisoner be the *only* person available to provide care to a seriously ill relative.

With those caveats, I find the primary cases cited by Mr. Dunich-Kolb to be readily distinguishable.

*United States v. Bucci*, 409 F. Supp. 3d 1 (D. Mass. 2019), a very brief opinion, granted compassionate relief where the defendant's parent was ailing and incapacitated (her condition is not further described), and the defendant had demonstrated rehabilitation by caring for terminally ill patients while in

prison. It was essential to the court's reasoning that the defendant was the "*only* available caregiver" (emphasis added); what made the situation extraordinary and compelling, in the court's view, was that in many other cases, "inmates may have siblings or other family members able to care for their parents." *Id.* That factor is present here; that a sibling says he is busy or unwilling to help is not enough to sway this Court, for the reasons stated above.

*United States v. Hernandez*, No. 16-20091-CR, 2020 WL 4343991 (S.D. Fla. Apr. 3, 2020), apparently followed substantial in-court proceedings, but the opinion itself is short and cryptic. There, the defendant was

> the only potential caregiver for his 84-year-old mother, . . . who suffers from degenerative ocular disease and cancer that renders her functionally blind. This condition requires frequent medical monitoring to prevent recurrence, including eye injections every six weeks. Moreover, [she] is in remission from a recent bout of cancer.

*Id.* at \*1. Our facts do not rise to that level.

The government, on the other hand, points out that denials of compassionate release applications based on the need to care for parents are common, either on general principle or specifically because the prisoner is not the only potential caregiver. *See, e.g., United States v. Goldberg*, Crim. No. 12-180, 2020 WL 1853298, at \*4 (D.D.C. Apr. 13, 2020) (relief denied, noting that even if care of parents were a cognizable basis, the record showed that there were relatives who could help care for the defendant's parents); *United States v. Crandle*, Crim. No. 10-35, 2020 WL 2188865, at \*4 (M.D. La. May 6, 2020) (denying compassionate release under the First Step Act where defendant failed to present evidence demonstrating that he is the only person who could care for his parents or that he would actually be able to care for his parents if released); *United States v. Ingram*, Crim. No. 14-40, 2019 WL 3162305, at \*2 (S.D. Ohio July 16, 2019) (denying compassionate release motion and noting that "[m]any, if not all inmates, have sick and aging parents" but that "[s]uch circumstance is not extraordinary"); *United States v. Hunter*, No. Crim. No. 6-

11

61, 2020 WL 127711, at *3 (S.D. Ohio Jan. 10, 2020) (denying defendant's compassionate release motion where the court did not find that the defendant's mother's medical condition constituted "extraordinary and compelling reasons"); *United States v. Nevers*, Crim. No. 16-88, 2019 WL 7281929 at *5 (E.D. La. Dec. 27, 2019) (holding it was not extraordinary and compelling that defendant had an aging mother with heart and lung conditions who was also responsible for taking care of an elderly stepfather and the defendant's disabled daughter).

These precedents inform, but do not dictate, the result I reach here. I assume, as I have said, that care of a parent could, on some set of facts, present an extraordinary and compelling case for compassionate release. But based on all of the circumstances here, I find that Mr. Dunich-Kolb's is not such an extraordinary and compelling set of facts.

### 4. § 3553(a) Factors

Finally, I must consider the foregoing in the context of the familiar sentencing factors of 18 U.S.C. § 3553(a), "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).[13] That requirement is no mere

---

[13]   (a) Factors To Be Considered in Imposing a Sentence. — The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

afterthought; it has independent bite. *See, e.g., United States v. Lisi*, 440 F.
Supp. 3d 246, 252 (S.D.N.Y. 2020), *reconsideration denied*, No. Crim. No. 15-
457, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020) (finding extraordinary
circumstances in that defendant was the only potential caregiver for his
extremely unwell mother, but nevertheless denying relief based on § 3553(a)
factors). Even if I had found Mr. Dunich-Kolb's health and family
circumstances to be extraordinary and compelling, I would deny relief based on
the § 3553(a) factors.

The discussion in *Lisi, supra*, which involved analogous facts, is highly
relevant here.

---

    (A) the applicable category of offense committed by the applicable
category of defendant as set forth in the guidelines—

        (i) issued by the Sentencing Commission pursuant to section 994(a)(1)
of title 28, United States Code, subject to any amendments made to such
guidelines by act of Congress (regardless of whether such amendments have
yet to be incorporated by the Sentencing Commission into amendments
issued under section 994(p) of title 28); and

        (ii) that, except as provided in section 3742(g), are in effect on the date
the defendant is sentenced; or

    (B) in the case of a violation of probation or supervised release, the
applicable guidelines or policy statements issued by the Sentencing
Commission pursuant to section 994(a)(3) of title 28, United States Code, taking
into account any amendments made to such guidelines or policy statements by
act of Congress (regardless of whether such amendments have yet to be
incorporated by the Sentencing Commission into amendments issued
under section 994(p) of title 28);

    (5) any pertinent policy statement—

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of
title 28, United States Code, subject to any amendments made to such policy
statement by act of Congress (regardless of whether such amendments have yet
to be incorporated by the Sentencing Commission into amendments issued
under section 994(p) of title 28); and

    (B) that, except as provided in section 3742(g), is in effect on the date the
defendant is sentenced.

    (6)  the need to avoid unwarranted sentence disparities among defendants
with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

As to the nature of the offense, the *Lisi* court first noted that the defendant had defrauded his victims in his role as an attorney. He "engaged in the offense for which this Court sentenced him while he was on pretrial or presentencing release for three other indictments. All of these facts, taken together, paint a portrait of a man with little compunction about doing others harm." 440 F. Supp. 3d at 252–53. Dunich-Kolb's use of his position as a tax adviser to take advantage of clients and defraud the government, after a prior conviction and even while on bail supervision in this case, is comparable.

Dunich-Kolb's criminal conduct was serious, deliberate and ongoing. It followed a conviction and service of a state sentence for a tax-related offense. It was accomplished through the defendant's falsely holding himself out as a CPA, in violation of a consent order. It included egregious acts of tax fraud involving the preparation of false returns for clients and himself. It involved fraud against clients, in that he filed fraudulent returns on their behalf and pocketed the refunds. In one instance, it entailed aggravated identity theft with respect to a deceased client. Part of the criminal conduct occurred while Dunich-Kolb was on bail supervision, which, after a failed cover-up, resulted in revocation of bail. The aggregate loss exceeded $2.2 million.

Second, the *Lisi* court noted that granting time served would neither "'afford adequate deterrence to criminal conduct' nor 'promote respect for the law.' 18 U.S.C. § 3553(a)(2)(A)-(B)." *Id.* at 253. There, the defendant, after completing another sentence, had "only just begun" to serve the sentence at issue. That cannot be said of Dunich-Kolb; he served his prior state sentence and has been incarcerated on this one since March 30, 2018, when his bail was revoked based on continued criminal activity. He has served over 31 months, or about half of his sentence, allowing for good time credits. But in my view, he has not served an amount that would adequately address the seriousness of the offense or serve the goals of punishment and deterrence.

The defendant in *Lisi* argued that he was "over-sentenced," *id.,* and Mr. Dunich-Kolb made similar arguments in connection with his own sentencing. But in fact the Court accepted some of his arguments and varied downward

11

significantly from the Guideline range. I did so in part because of a mental condition that did not negate criminal responsibility but seemed to impede his ability to acknowledge his criminality. I also did so because he had served a state sentence for related, if not overlapping, conduct.

Third, the *Lisi* court noted that the defendant seemed to accept no responsibility for his offenses:

> The closest Lisi comes to contrition in his Motion is in saying that he made "mistakes" from 2009 to 2012. . . . Otherwise, Lisi offers no sentiments of remorse for his past conduct, and instead continues to argue that he was "over-sentenced" and that there is no "justifiable reason" to keep him in prison.

*Id.*

In his current motion, Mr. Dunich-Kolb similarly acknowledges mistakes; he "regret[s his] foolish stupidity and circumstances that led to [his] Internal Revenue Service arrest," and cites his clean disciplinary record as evidence that he will not re-recidivate. (DE 108 at 7).[14] Even taking his current acknowledgement of "stupidity" at face value, defendant's earlier recidivism and lack of remorse still suggest to me that early release after service of 2 2/3 years would run contrary to the goals of punishment, deterrence and protection of the public.

Throughout the case, Mr. Dunich-Kolb stubbornly maintained that he was an innocent victim of a vendetta by the investigating agents. As I observed at sentencing:

> Even today the defendant is essentially blaming others, primarily the people who investigated him but also his clients. He served a state jail sentence. He was indicted federally. Under indictment he started up a whole new scheme, and in contemporaneous communications sort of bragged about how he was hoodwinking the federal agents, and so I'm not seeing a lot of remorse here.

---

[14]     Somewhat undercutting, by the way, his earlier motion claiming that he could not participate in his defense because he was in the grip of a psychotic delusional disorder and believed he was simply the victim of persecution by an IRS agent who was jealous of his prosperity. (*See* Competency opinion, DE 35.)

(Sentencing Tr. 144).

One need not be cynical about promises of future good conduct to recognize that the past, too, has its claims. Again, the comments of the *Lisi* court are to the point:

> The Court understands that [the mother] may be suffering, and it has the deepest sympathy for her plight. When a defendant's life intersects with the criminal justice system, it affects everyone around that defendant, including those who do not merit such punishment. But Brandon Lisi has known of his mother's declining health for the last ten years. He could have devoted himself to planning for her care. Instead, he chose to devote his energies towards a series of frauds for which he has to this day failed to account for.

*Id.* at 253.

As for the remaining factors, restitution remains an issue, and as usual, that is not an interest served by imprisonment. The Guidelines, policy statements, and the available range of sentences have been calculated and taken into account. For the reasons expressed above, compassionate release at this point would create a disparity with sentences given to similar offenders. Given the absence of a convincing showing on the First Step Act factors, that disparity would be an unwarranted one. The Guidelines and policy statements have been calculated and considered. Rehabilitative programs, presumably available in or out of prison, appear to be a neutral factor, and are not being stressed by either party.

Given the foregoing, the likelihood of flight and danger to the community under the Bail Reform Act are of secondary importance. Mr. Dunich-Kolb has appeared as required and does not appear to be a flight risk. His offenses are non-violent, and he states that he has no record of institutional infractions. On the other hand, he did commit further offenses while on supervision in this case, resulting in the revocation of bail. So while there is no "danger" to another person as such, there is some risk of recidivism.

To summarize: Obesity or being overweight, in the context of conditions at USP-Canaan, is not an extraordinary or compelling circumstance. The

defendant's desire to care for his mother, while commendable, is not sufficiently compelling to outweigh the interest in his continued incarceration, particularly given the availability of at least one other family member who is available, if disinclined, to help. Finally, irrespective of allegedly extraordinary and compelling circumstances, I would find that the § 3553(a) factors weigh too heavily against release after service of 2 2/3 years. Having considered the relevant factors, I will deny the application for compassionate release.

### B. Transfer to Home Confinement

Mr. Dunich-Kolb invokes the separate remedy of transfer to home confinement, but the Court lacks the authority to grant it.

The Bureau of Prisons is statutorily authorized to transfer certain inmates to home confinement during the last six months or 10% of a sentence. *See* 18 U.S.C. § 3624(c)(2), 34 U.S.C. § 60541(c). Under the CARES Act, BOP was authorized to, and did, extend the maximum amount of time for which home confinement could be substituted for imprisonment. *See* CARES Act § 12003(b). BOP is currently prioritizing inmates who have served 50% of their sentences or have served 25% and have less than 18 months remaining.

Pursuant to guidelines promulgated by the Attorney General, BOP instituted its own review in response to the COVID-19 pandemic. It prioritized certain cases for transfer to home confinement, based on inmate characteristics, the inmate's disciplinary record, medical risk, danger to the community, and other factors. Priority was given to three institutions, FCI Oakdale, Danbury, and Elkton, where the risk and need were most acute.

Mr. Dunich-Kolb moves to invoke that remedy of transfer to home confinement, pursuant to 18 U.S.C. § 3624(c). As to such an application, however, the BOP has the first and last word. The statute does not grant the district court authority to modify the sentence in that manner, and a district court has no general authority to dictate the place of confinement as such. *See* 18 U.S.C. 3621(b); *United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Gottstein v. Finley*, No. 20-0935, 2020 WL 3078028, at *6-*7 (M.D. Pa. June 10,

11

2020) (holding that the determination of whether an inmate is eligible for home confinement under the CARES Act rests solely with the BOP); *United States v. Catanzarite*, Crim. No. 18-0362, 2020 WL 2786927, at *2 (D.N.J. May 29, 2020) (denying motion to convert sentence to home confinement because inmate did not suggest any authority to rebut Government's argument that the court lacked authority to do so). Nor does a federal prisoner have a constitutional right to service of sentence in a particular place. *See Sandin v. Connor,* 515 U.S. 472, 478 (1995).

Mr. Dunich-Kolb's alternative request for relief under 18 U.S.C. § 3624(c) must therefore be denied.

## ORDER

Accordingly, for the reasons expressed above,

IT IS this 5th day of November, 2020

ORDERED that the motion (DE 108, 114, as redacted, DE 115) for compassionate release under 18 U.S.C. § 3582(c)(1)(A), or in the alternative for transfer to home confinement under 18 U.S.C. § 3624(c), is DENIED.

/s/ Kevin McNulty

_____
KEVIN MCNULTY
United States District Judge

11