## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>    **v.**<br><br>**Wayne DUNICH-KOLB,**<br>                **Defendant.** | Crim. No. 14-150 (KM)<br><br>**OPINION and ORDER** |

**McNULTY, DISTRICT JUDGE**

Before the Court is the second motion (DE 118) of defendant Wayne Dunich-Kolb for a reduction of sentence under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). As he did at sentencing and in his prior, denied application (*see* DE 117), Mr. Dunich-Kolb points to his medical condition and his need to care for his aged and ailing mother, but now points to additional circumstances. Having considered the parties' submissions, I decide this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer,* 573 F.3d 151, 154 (3d Cir. 2009). For the following reasons, the motion is GRANTED IN PART, and the sentence of imprisonment is reduced from 72 months to 60 months.

## I.    PROCEDURAL BACKGROUND

Having presided over the criminal case, I am fully familiar with the background, which I will summarize only briefly.

On January 11, 2019, Mr. Dunich-Kolb pled guilty to tax and fraud charges: Count 4[1] (aiding preparation of false tax return, 26 U.S.C. § 7206(2)); Count 15 (subscribing false tax return, 26 U.S.C. § 7206(1)); Count 25 (mail fraud on pretrial release, 18 U.S.C. §§ 1341, 1347); and Count 29 (aggravated identity theft, 18 U.S.C. § 1028A(a)(1)).

---

[1]    Count references are to the Second Superseding Indictment.

On September 17, 2019, I sentenced Mr. Dunich-Kolb to 72 months' imprisonment. (DE 104) That sentence represented a downward departure from the Guidelines range of 87–102 months.

By Opinion and Order dated November 11, 2020, I denied Mr. Dunich-Kolb's prior application for First Step relief. (DE 117) At the time he was imprisoned at USP Canaan in the satellite minimum security camp facility. At some point, Mr. Dunich-Kolb was moved to his current place of incarceration, Metropolitan Detention Center in Brooklyn, New York ("MDC"). His projected release date is May 10, 2023. (DE 118-6 at 15)

Mr. Dunich-Kolb's current motion was filed on August 10, 2021. (DE 118) The government filed a response (DE 119), and Dunich-Kolb filed a supplemental brief (DE 120),[2] to which the government filed a response (DE 121). On November 8, 2021 (DE 122) and December 23, 2021 (DE 123), Mr. Dunich-Kolb filed additional papers, to which the government has not responded.

## II.    LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's

---

[2]    The Defendant's supplemental brief states that it was written by "Sean Fitzgerald Patrick Mescall, Esq." The government notes that, while Mr. Mescall has availed himself of the "Esq." designation, he is not in fact an attorney, and it cites his 2014 conviction and 16-year sentence on fraud charges. *See* https://www.justice.gov/usao-wdnc/pr/charlotte-man-sentenced-more-16-years-prison-operating-ponzi-scheme-defrauded-investors. I have nevertheless considered the brief, which actually adds little.

facility, whichever is earlier, may reduce the term of
imprisonment (and may impose a term of probation or
supervised release with or without conditions that
does not exceed the unserved portion of the original
term of imprisonment), after considering the factors
set forth in section 3553(a) to the extent that they are
applicable, if it finds that--

> (i) extraordinary and compelling reasons warrant
> such a reduction; [. . .]

> and that such a reduction is consistent with
> applicable policy statements issued by the
> Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).
The United States Sentencing Commission has promulgated a policy statement
that, in relevant part, allows a court to grant compassionate release or a
sentence reduction where: (i) extraordinary and compelling reasons warrant a
reduction in a defendant's sentence; (ii) the defendant is not a danger to the
safety of others or to the community; and (iii) release from custody complies
with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING
GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain
circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13,
Application Note 1(A)–(D).[3] That policy statement was enacted at a time when

---

[3]     The application note lists three specific circumstances that qualify as
extraordinary and compelling. Generally speaking, the enumerated circumstances
include: (i) a terminal illness or a serious medical condition that substantially
diminishes the ability of the defendant to provide self-care within the environment of a
correctional facility and from which he or she is not expected to recover; (ii) the
defendant is at least 65 years old, is experiencing a serious deterioration in physical or
mental health because of the aging process, and has served at least 10 years or 75
percent of his or her term of imprisonment, whichever is less; or (iii) certain family
circumstances exist where the defendant would be the only available caregiver for his
or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note
1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which
provides that "other reasons" may be sufficient if "[a]s determined by the Director of
the [BOP], there exists in the defendant's case an extraordinary and compelling reason

only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias,* 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.' " *Parker Drilling Mgmt. Servs.,*

---

other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

> *Ltd. v. Newton*, —— U.S. ——, 139 S. Ct. 1881, 1890, 204 L.Ed.2d
> 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3,
> 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress
> reenacted the compassionate-release statute without any
> alterations to the phrase "extraordinary and compelling reasons," it
> was reasonable for the court to conclude that the phrase largely
> retained the meaning it had under the previous version of the
> statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir.
> 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore consider the grounds asserted by the defendant, whether or not specifically authorized by the Guideline policy statement. In particular, I consider whether the likelihood of COVID-19 infection, the prisoner's physical condition, and the need to care for his mother rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if he were released.

## III.   ANALYSIS

### A.   Exhaustion of remedies

Before proceeding to the merits of a motion for a reduction in sentence, a defendant must meet § 3582(c)(1)(A)'s exhaustion requirement. The statute requires either that that the defendant has exhausted all administrative remedies, or that, since the submission of a request to the warden, 30 days have passed without a decision being rendered. *United States v. Raia,* 954 F.3d 594, 597 (3d Cir. 2020). The United States concedes that Mr. Dunich-Kolb submitted a request for transfer to home confinement and/or compassionate release to the Warden, that more than 30 days have passed, and that the request was in any event denied.[4] (DE 118-1 at 2) The exhaustion requirement therefore does not stand as a bar to this motion.

---

[4]     To the extent the motion seeks an order from this Court transferring the defendant to home confinement, it must be denied. As pointed out in my prior Opinion (DE 117), the Court has no authority to grant such relief, which is governed by different standards and is reserved solely to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement

### B.    Extraordinary and Compelling Circumstances

#### 1. Medical Grounds

Mr. Dunich-Kolb's First Step Act application for reduction of sentence is based in part on the danger to his health if he should contract a COVID-19 infection while in the institutional setting of MDC. My review of the petition and the records supplied to the Court yields the conclusion that there are no extraordinary and compelling medical circumstances here.

Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must consider (a) the likelihood that a COVID infection would have severe consequences for this particular person, and (b) the more general danger of infection at the institution where the person is incarcerated.

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (most recently updated as of Dec. 14, 2021) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 80% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors. These, in abbreviated form, are Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease, Dementia, Diabetes, Down syndrome, Heart conditions, HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

Mr. Dunich-Kolb is approximately 57 years old; he is not an "older

---

decisions, such as transfers to home confinement, are committed to the BOP's sole discretion.").

adult," and will not have reached the age of 65 on his projected release date. His prison medical records reveal that he is generally healthy. Except as noted here, they reveal routine complaints which have been dealt with appropriately.

*Obesity and Overweight* is listed as a risk factor in the CDC List. In my prior opinion, I cited BOP medical records showing that Mr. Dunich-Kolb was 73 inches tall and weighed 210 pounds, yielding a BMI of 27.7, in the overweight but not obese range. The CDC List formerly listed obesity (BMI $\geq$ 30), as a risk factor, and overweight (BMI 25–30) as a factor that "might" present an increased risk. Since my prior opinion, CDC abolished the distinction, and now states that any BMI over 25 "can make you more likely" to suffer severe illness as a result of a COVID infection, noting that the risk "increases sharply" in conjunction with the elevation of BMI. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Mr. Dunich-Kolb also cites pulmonary issues. *Chronic lung diseases,* such as moderate to severe asthma or COPD, are identified as risk factors in the CDC list. Mr. Dunich-Kolb claims that childhood bronchial issues have now come "to the fore," and diagnoses himself with "stage four bronchitis." These conditions are not reflected in the medical records, except to note that Mr. Dunich-Kolb, in July 2020, requested that his records be updated to reflect sleep apnea and irregular breathing during sleep. (DE 119-1 at 91) Prior to sentencing, he reported having been treated for pneumonia in January 2017. (PSR ¶ 107) There is no sufficient evidence that Mr. Dunich-Kolb suffers from any pulmonary condition recognized by the CDC as a risk factor. There is no evidence sufficient to suggest that pulmonary conditions, alone or in combination with others, would support a finding of extraordinary and compelling reasons under the standards described above.

In my prior Opinion, I rejected Mr. Dunich-Kolb's application based on, *inter alia,* obesity, citing the prior version of the CDC guidelines and cases

thereunder.[5] Since then, courts have routinely found that the revision to the CDC List does not warrant a finding of extraordinary circumstances at the level of overweight or mild obesity, even in combination with hypertension or asthma, which are not present here. Judge Wigenton has collected a number of such cases under the revised version of the CDC guidelines:

> Despite the risk of COVID-19, multiple decisions in the Third Circuit, and multiple decisions in this District, have denied compassionate release to inmates suffering from obesity, hypertension, and/or other health issues. *See, e.g., United States v Kenneth Irving Carter*, Crim. No. 21-1090, 2021 WL 4916189, at *1 (3d Cir. Oct. 21, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's severe obesity); *United States v. Patricia Fountain*, Crim. No. 21-1313, 2021 WL 4772957, at *1–2 (3d Cir. Oct. 13, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "obesity, concerning blood work levels, high serotonin levels, migraines resulting from adrenoleukodystrophy, cognitive decline, anxiety, depression, panic attacks, and post-traumatic stress disorder"); *United States v. Troy Wragg*, Crim. No. 20-3430, 2021 WL 4459455, at *1, *3 (3d Cir. Sept. 29, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "obesity, seizure disorder, and

---

[5]    *E.g., United States v. Cherry*, No. CR 09-715 (SDW), 2020 WL 5868800, at *2 (D.N.J. Oct. 2, 2020), the court denied relief where, although the prisoner had a BMI in the low-obese range of 30 to 33, there was no evidence of other health problems, inability to lose weight, inadequate health care, or diminished ability to provide self-care. So too here. *See also United States v. Gore*, Crim. No. 10-250, 2020 WL 3962269, at *3–5 (D.N.J. July 13, 2020) (finding that defendant's obesity, asthma, and other factors did not constitute "extraordinary and compelling reasons that would justify his compassionate release," where the facility was providing adequate care); *United States v. Wax*, Crim. No. 14-251, 2020 WL 3468219, at *3 (D.N.J. June 25, 2020) (denying defendant's motion for compassionate release for lack of an extraordinary and compelling reason, even though he suffered from hypertension and obesity, with a BMI of 36, because he was receiving "regular and consistent medical care"); *United States v. Falci*, Crim. No. 17-228, 2020 WL 3410914, at *1, *4 (D.N.J. June 22, 2020) (denying motion for compassionate release where defendant was 60 years old and suffered from obesity, hypertension, and other health issues); *United States v. Bleicher*, Crim. No. 19-99, 2020 WL 2744606, at *3 (D.N.J. May 27, 2020) (denying compassionate release for a defendant with a BMI of 37.7); *United States v. Alexander*, Crim. No. 19-32, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying compassionate release where defendant suffered from hypertension and obesity but medical records showed that Bureau of Prisons was "adequately managing [his] medical care").

hypertension"); *United States v. Edward Hicks*, Crim. No. 20-3512, 2021 WL 4316829, at *1–2 (3d Cir. Sept. 23, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "asthma, pre-diabetes, hypertension, and obesity"); *United States v. Tyheed Jefferson*, Crim. No. 21-2020, 2021 WL 4279626, at *1, *3 (3d Cir. Sept. 21, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's obesity and cryptococcosis); *United States v. Lee*, Crim. No. 13-56, 2021 WL 4077562, at *2–3 (D.N.J. Sept. 8, 2021) (denying motion for compassionate release where defendant suffered from an anxiety disorder and mild hypertension); *United States v. Preschel*, Crim. No. 19-00186, 2021 WL 3930716, at *2, *4 (D.N.J. Sept. 2, 2021) (denying defendant's motion for compassionate release despite suffering from "obstructive sleep apnea, hypertension, diabetes, obesity, depression, and some kind of personality disorder"); *United States v. Germaine H. King*, Crim. No. 18-379, 2021 WL 3783157, at *4, *5 (D.N.J. Aug. 24, 2021) (denying defendant's motion for compassionate release where defendant is suffering from obesity and asthma).

*United States v. Brashear*, No. CR 15-00636 (SDW), 2021 WL 5239119, at *3 (D.N.J. Nov. 10, 2021).

I move on to consider the likelihood of contracting COVID-19 at MDC. Measures taken by the BOP to contain infections are by now well known. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp, Here, I focus on the current infection figures.

MDC houses approximately 1652 prisoners. The latest reported COVID figures for MDC are as follows

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 8 | 14 | 1 | 0 | 705 | 128 |

https://www.bop.gov/coronavirus/[6] To be sure, these figures reveal that over the past two years there have been significant outbreaks of positive COVID test results among the inmates and staff, just as there have been in the community

---

[6]    The last four columns, by their nature, reflect cumulative figures, and do not state the extent of turnover in the prison population.

at large. It is also true that MDC, a transfer facility, may have a greater turnover of population than other facilities. Still, the current rate of 8 cases out of 1652 current prisoners (< .5%) is not severe.[7]

Further reducing the risk to Mr. Dunich-Kolb is his immunity status following a prior COVID-19 infection. BOP records show that Mr. Dunich-Kolb had contracted an asymptomatic COVID-19 infection as of January 26, 2021. (DE 119-2 at 7, 43) He reported no ongoing effects. (*Id.* at 15, 29) The CDC advise that a past infection confers a degree of immunity that tends to prevent or mitigate reinfection. https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html. Reinfections do occur, however.

More significant, however, is Mr. Dunich-Kolb's full-vaccination status while in prison. He received the initial dose of the Pfizer vaccine on April 22, 2021, and the follow-up dose on May 14, 2021. (DE 119-2 at 38.) The record does not reveal whether he has received a booster.

I do not propose a full analysis of complex COVID-19 vaccine effectiveness statistics. Suffice it to say that the vaccines are highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). As of November 2021, unvaccinated adults in 28 US jurisdictions had four times the risk of testing positive for COVID-19, and fifteen times the risk of dying, when compared to fully vaccinated individuals. https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. The ratios were greater for persons over 65 years of age. *Id.* As of December 2021, the rate of COVID-19 hospitalization for adults 65 and over

---

[7]    Outside of prison walls, trends are similar. Infection rates in the New York/New Jersey area have peaked and precipitously fallen, leading to widespread relaxation of measures such as compulsory masking.

was 17 times higher for the unvaccinated.[8]  https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination. The rates are constantly changing, of course, but the CDC summarizes its effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

      I do not adopt the government's suggestion that vaccination absolutely precludes a finding of COVID-related extraordinary circumstances. I do agree with my colleagues, however, that vaccination is a highly relevant factor. *See generally United States v. Jaquwin Marlin,* No. CR 19-168 (SDW), 2021 WL 5711587, at *2 (D.N.J. Dec. 2, 2021) (declining to find extraordinary circumstances where defendant, although at higher risk as a result of obesity, had been vaccinated); *United States v. Dennison,* Crim. No. 09-402 (NLH), 2021 WL 5630296, at *2 (D.N.J. Dec. 1, 2021) (declining to find extraordinary circumstances where defendant had returned positive result for COVID infection and subsequently been vaccinated). I give Mr. Dunich-Kolb's vaccinated status considerable weight in assessing the likelihood that he will suffer a serious infection.

      In short, I cannot find that Mr. Dunich-Kolb is at any unusual risk of COVID-19 infection, or serious consequences therefrom, as a result of his incarceration. I do not find that his medical circumstances are extraordinary and compelling, and will not grant release on a medical basis.

---

[8]      For those who have received boosters, that hospitalization ratio is approximately tripled. *Id.* Because Mr. Dunich-Kolb's booster status is unknown, I have not focused on this aspect.

### 2. Need to care for close relative

Mr. Dunich-Kolb also seeks compassionate release so that he can care for his mother, who is 82 years old and ailing. For convenience, I reproduce here the analysis from my prior Opinion (DE 117), updating as necessary thereafter:

> Mr. Dunich Kolb's second claim of "extraordinary and compelling" circumstances arises from his stated need to care for his elderly mother. It is not disputed that her condition is such that she requires very significant assistance.[9]

> I consider first whether such a claim is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As noted above, I accept *arguendo* that the Guidelines and commentary, while relevant, do not rigidly constrain the Court's discretion to recognize circumstances that are extraordinary and compelling. *See* n.6, *supra*.

> Under the applicable Sentencing Guidelines, certain family circumstances may qualify as "extraordinary and compelling reasons." The closest fit is application note 1(C) to Sentencing Guidelines § 1B1.13:

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

> U.S.S.G. § 1B1.13, cmt. n.1(C).

> Mr. Dunich-Kolb's situation—involving care of a parent, as opposed to a child or incapacitated spouse—does not precisely match the ones enumerated in the Guideline or policy statements. But it does bear, if I may put it that way, a family resemblance,

---

[9]    [Note: footnotes are reproduced from the original, but the numbers have changed.] In a letter, her physician discloses her age and states that she suffers from medical conditions which, for privacy reasons, will not be repeated here. He opines that "[w]ithout [Mr. Dunich-Kolb's] help, her health will deteriorate." (DE 114-2 at 2).

and I will consider it.[10]  In doing so, I must consider whether these particular circumstances are extraordinary and compelling in their own right.

A compassionate release application must seek more than just a second bite at issues properly considered at sentencing. And to some degree, I have already considered this issue; at sentencing, Mr. Dunich-Kolb pressed the need to care for his elderly parents[11] as a factor in mitigation of sentence. I did not find those circumstances sufficient to warrant a downward departure (Sentencing Tr. 99),[12] although I did consider them in mitigation. They were brought to the Court's attention by counsel (Sentencing Tr. 114) and indeed by Mr. Dunich-Kolb's mother, who addressed the court directly (*id.* 138–39).

Mr. Dunich-Kolb's mother has a number of chronic conditions; she is not hospitalized, but does concededly require significant care. The question becomes whether the unavailability of Mr. Dunich-Kolb to provide such care rises to the level of extraordinary and compelling circumstances. I conclude that it does not.

Dunich-Kolb has two adult siblings. A brother, in particular, is available. The brother has submitted a letter stating that, in light of his family responsibilities and status as an "essential" Verizon employee, he is too busy to help. (DE 114-2 at 4). No doubt it would be an inconvenience to take over some of the caretaker responsibilities, assuming that he is not doing so already. It is not

---

[10]    [Footnoted cross-reference omitted.]

[11]    Mr. Dunich-Kolb's father passed away in March 2020. (DE 114-2 at 2).

[12]    The first is -- I will only discuss briefly, is a departure for family responsibilities. I do recognize the caretaker function that Mr. Dunich- Kolb is fulfilling, but there are other relatives available. I don't see this as being different in kind or unusual with regard to other cases that I see. Look, it's always a hardship on the family when a person is incarcerated. But recognizing that in the proper case I do have the discretion and the legal ability to make such a departure, I will not exercise my discretion to do so.

(Sentencing Tr. 99).

Sentencing, because it presented a number of preliminary Guidelines issues requiring an evidentiary hearing and rulings by the Court, occurred over the space of two days. The two volumes of the sentencing transcript, filed at DE 101 and 111, are paginated consecutively.

uncommon, however, for a criminal sentence to impose burdens, sometimes severe ones, on family members. The motion is silent as to who has been filling the role of caretaker since Mr. Dunich-Kolb was first incarcerated in March 2018. No facts are proffered regarding efforts to hire or arrange for alternative care, whether at home or elsewhere.

No case, whether favorable or unfavorable to Mr. Dunich-Kolb's position, is likely to be completely on point. Moreover, comparisons between cases granting and denying relief are to some degree confounded by the courts' divergent views as to the continuing binding effect of the Guidelines and commentary after the passage of the First Step Act. [Cross-reference omitted.] But those views do not diverge as much as might be assumed. Typically, even courts taking the strict view will assume *arguendo* that care of parents might be grounds for relief, but deny the application on the merits; conversely, even courts taking the broader view acknowledge that the grounds must be generally consistent with, if not precisely dictated by, the Guidelines and commentary as written. One common thread, whether relief is granted or denied, is the requirement that the prisoner be the *only* person available to provide care to a seriously ill relative.

[Case law discussion omitted.]

(Opinion, DE 117 at 11–13)

Mr. Dunich-Kolb has updated the court as to his mother's situation. She has a progressive medical condition which has deteriorated, and apparently has not managed to find a substitute caretaker. Attached to the motion is a letter (DE 118-2) from the mother, attesting to her ailments, which are surely genuine. For privacy reasons, I will not detail the particulars any more than necessary. It is more than plausible that these conditions result in severe pain and severely compromise her mobility. Her condition also suggests that she would be at unusual risk of severe injury from a fall.

There is corroboration. A kindly neighbor confirms the mother's condition as well as the fact, apparently not contested, that Mr. Dunich-Kolb had been the mother's sole caretaker. (DE 118-2 at 4) A treating osteopath confirms that Mrs. Kolb requires assistance with the activities of daily living,

including self-administration of injections. (DE 118-2 at 5) A radiological report confirms that there have been severe multilevel degenerative changes to her condition, with attendant bone fractures. (DE 118-2 at 6–8)

Mr. Dunich-Kolb, unlike some applicants, is not merely promising to fulfill the role of caretaker in the future. Before his incarceration, he resided in his parents' home and cared for them. The mother, the neighbor, and the medical evidence all agree that Mr. Dunich-Kolb has played that caretaker role in the past.

As before, there is a statement from Mr. Dunich-Kolb's brother, to the effect that his own family obligations are all-consuming, and that he is "considered an essential worker" by his employer, Verizon. I did not find that statement convincing before, and I remain unconvinced of his unavailability. Be that as it may, all indications are that, for whatever reason, the brother does nothing to provide day-to-day assistance to his mother. Mr. Dunich-Kolb states in addition that that the brother is now moving out of state, although he submits no documentation of that.

It is not unusual that family members of persons convicted of crimes suffer undeservedly. It is also tragic that Mr. Dunich-Kolb has, through his own criminal actions spanning a period of years, placed his mother in this position. Still, the Court cannot blind itself to the collateral suffering created by Mr. Dunich-Kolb's well-deserved sentence of incarceration. Under these rare circumstances, I find that he has made a showing of extraordinary and compelling circumstances, warranting a reduction of sentence.

### 3. 18 U.S.C. § 3553(a) Factors

I therefore discuss the factors under 18 U.S.C. § 3553(a) and any risk of flight or danger to the community in the event of release. For convenience, I reproduce here the analysis from my prior Opinion (DE 117), updating as necessary thereafter.

Finally, I must consider the foregoing in the context of the familiar sentencing factors of 18 U.S.C. § 3553(a), "to the extent

that they are applicable." 18 U.S.C. § 3582(c)(1)(A).[13] That
requirement is no mere afterthought; it has independent bite. *See,*

---

[13]  **(a) Factors To Be Considered in Imposing a Sentence. —** The court shall impose
a sentence sufficient, but not greater than necessary, to comply with the purposes
set forth in paragraph (2) of this subsection. The court, in determining the
particular sentence to be imposed, shall consider—

**(1)** the nature and circumstances of the offense and the history and characteristics
of the defendant;

**(2)** the need for the sentence imposed—

   **(A)** to reflect the seriousness of the offense, to promote respect for the law, and
   to provide just punishment for the offense;

   **(B)** to afford adequate deterrence to criminal conduct;

   **(C)** to protect the public from further crimes of the defendant; and

   **(D)** to provide the defendant with needed educational or vocational training,
   medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for—

   **(A)** the applicable category of offense committed by the applicable category of
   defendant as set forth in the guidelines—

      **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title
      28, United States Code, subject to any amendments made to such guidelines
      by act of Congress (regardless of whether such amendments have yet to be
      incorporated by the Sentencing Commission into amendments issued
      under section 994(p) of title 28); and

      **(ii)** that, except as provided in section 3742(g), are in effect on the date the
      defendant is sentenced; or

   **(B)** in the case of a violation of probation or supervised release, the applicable
   guidelines or policy statements issued by the Sentencing Commission pursuant
   to section 994(a)(3) of title 28, United States Code, taking into account any
   amendments made to such guidelines or policy statements by act
   of Congress (regardless of whether such amendments have yet to be
   incorporated by the Sentencing Commission into amendments issued
   under section 994(p) of title 28);

**(5)** any pertinent policy statement—

   **(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title
   28, United States Code, subject to any amendments made to such policy
   statement by act of Congress (regardless of whether such amendments have yet
   to be incorporated by the Sentencing Commission into amendments issued
   under section 994(p) of title 28); and

   **(B)** that, except as provided in section 3742(g), is in effect on the date the
   defendant is sentenced.

*e.g., United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020), *reconsideration denied*, No. 15 CR. 457 (KPF), 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020) (finding extraordinary circumstances in that defendant was the only potential caregiver for his extremely unwell mother, but nevertheless denying relief based on § 3553(a) factors). Even if I had found Mr. Dunich-Kolb's health and family circumstances to be extraordinary and compelling, I would deny relief based on the § 3553(a) factors.

The discussion in *Lisi, supra*, which involved analogous facts, is highly relevant here.

As to the nature of the offense, the *Lisi* court first noted that the defendant had defrauded his victims in his role as an attorney. He "engaged in the offense for which this Court sentenced him while he was on pretrial or presentencing release for three other indictments. All of these facts, taken together, paint a portrait of a man with little compunction about doing others harm." 440 F. Supp. 3d at 252–53. Dunich-Kolb's use of his position as a tax adviser to take advantage of clients and defraud the government, after a prior conviction and even while on bail supervision in this case, is comparable.

Dunich-Kolb's criminal conduct was serious, deliberate and ongoing. It followed a conviction and service of a state sentence for a tax-related offense. It was accomplished through the defendant's falsely holding himself out as a CPA, in violation of a consent order. It included egregious acts of tax fraud involving the preparation of false returns for clients and himself. It involved fraud against clients, in that he filed fraudulent returns on their behalf and pocketed the refunds. In one instance, it entailed aggravated identity theft with respect to a deceased client. Part of the criminal conduct occurred while Dunich-Kolb was on bail supervision, which, after a failed cover-up, resulted in revocation of bail. The aggregate loss exceeded $2.2 million.

Second, the *Lisi* court noted that granting time served would neither "'afford adequate deterrence to criminal conduct' nor

---

**(6)**  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

'promote respect for the law.' 18 U.S.C. § 3553(a)(2)(A)-(B)." *Id.* at 253. There, the defendant, after completing another sentence, had "only just begun" to serve the sentence at issue. That cannot be said of Dunich-Kolb; he served his prior state sentence and has been incarcerated on this one since March 30, 2018, when his bail was revoked based on continued criminal activity. He has served over 31 months, or about half of his sentence, allowing for good time credits. But in my view, he has not served an amount that would adequately address the seriousness of the offense or serve the goals of punishment and deterrence.

The defendant in *Lisi* argued that he was "over-sentenced," *id.,* and Mr. Dunich-Kolb made similar arguments in connection with his own sentencing. But in fact the Court accepted some of his arguments and varied downward significantly from the Guideline range. I did so in part because of a mental condition that did not negate criminal responsibility but seemed to impede his ability to acknowledge his criminality. I also did so because he had served a state sentence for related, if not overlapping, conduct.

Third, the *Lisi* court noted that the defendant seemed to accept no responsibility for his offenses:

The closest Lisi comes to contrition in his Motion is in saying that he made "mistakes" from 2009 to 2012. . . . Otherwise, Lisi offers no sentiments of remorse for his past conduct, and instead continues to argue that he was "over-sentenced" and that there is no "justifiable reason" to keep him in prison.

*Id.*

In his current motion, Mr. Dunich-Kolb similarly acknowledges mistakes; he "regret[s his] foolish stupidity and circumstances that led to [his] Internal Revenue Service arrest," and cites his clean disciplinary record as evidence that he will not re-recidivate. (DE 108 at 7)[14] Even taking his current acknowledgement of "stupidity" at face value, defendant's earlier recidivism and lack of remorse still suggest to me that early release

---

[14]   Somewhat undercutting, by the way, his earlier motion claiming that he could not participate in his defense because he was in the grip of a psychotic delusional disorder and believed he was simply the victim of persecution by an IRS agent who was jealous of his prosperity. (*See* Competency opinion, DE 35.)

after service of 2 2/3 years would run contrary to the goals of punishment, deterrence and protection of the public.

Throughout the case, Mr. Dunich-Kolb stubbornly maintained that he was an innocent victim of a vendetta by the investigating agents. As I observed at sentencing:

> Even today the defendant is essentially blaming others, primarily the people who investigated him but also his clients. He served a state jail sentence. He was indicted federally. Under indictment he started up a whole new scheme, and in contemporaneous communications sort of bragged about how he was hoodwinking the federal agents, and so I'm not seeing a lot of remorse here.

(Sentencing Tr. 144)

One need not be cynical about promises of future good conduct to recognize that the past, too, has its claims. Again, the comments of the *Lisi* court are to the point:

> The Court understands that [the mother] may be suffering, and it has the deepest sympathy for her plight. When a defendant's life intersects with the criminal justice system, it affects everyone around that defendant, including those who do not merit such punishment. But Brandon Lisi has known of his mother's declining health for the last ten years. He could have devoted himself to planning for her care. Instead, he chose to devote his energies towards a series of frauds for which he has to this day failed to account for.

*Id.* at 253.

As for the remaining factors, restitution remains an issue, and as usual, that is not an interest served by imprisonment. The Guidelines, policy statements, and the available range of sentences have been calculated and taken into account. For the reasons expressed above, compassionate release at this point would create a disparity with sentences given to similar offenders. Given the absence of a convincing showing on the First Step Act factors, that disparity would be an unwarranted one. The Guidelines and policy statements have been calculated and considered. Rehabilitative programs, presumably available in or out of prison, appear to be a neutral factor, and are not being stressed by either party.

19

> Given the foregoing, the likelihood of flight and danger to the community under the Bail Reform Act are of secondary importance. Mr. Dunich-Kolb has appeared as required and does not appear to be a flight risk. His offenses are non-violent, and he states that he has no record of institutional infractions. On the other hand, he did commit further offenses while on supervision in this case, resulting in the revocation of bail. So while there is no "danger" to another person as such, there is some risk of recidivism.

(Opinion, DE 117 at 15–20)

That earlier analysis is incorporated here. The sentence I imposed was well deserved and amply justified by the § 3553(a) factors, which I fully discussed at the time; indeed it represented a downward variance from the Guidelines range, based on psychological and other factors. The concerns that led me to reject Mr. Dunich-Kolb's prior First Step application, however, are somewhat reduced today.

To begin with he has of course served a greater proportion of his sentence than he had at the time of his prior application. His 72-month sentence began to run on March 30, 2018, and he has currently served over 46 months. As of his presumptive 2023 release date he will have served some 61 months. Thus Mr. Dunich-Kolb has currently served about 64% of his original, 72-month sentence, and 75% of his presumptive 61-month term of incarceration.

Mr. Dunich-Kolb also points to his conditions of confinement. I agree with the government that a First Step Act application would not be the forum for a conditions-of-confinement claim. Nevertheless, I perceive that the punitive component of a sentence is not necessarily measured in months alone. Mr. Dunich-Kolb has served a significant portion of his sentence in holding facilities not necessarily designed with long-term incarceration in mind. Starting on March 30, 2018, and for ten months thereafter, he was detained pretrial at the Essex County Correctional Facility, based on his violation of conditions of release. Following his guilty plea and imposition of sentence, he

was committed to the custody of BOP on January 29, 2020.[15] (DE 118-6 at 11) From that date, and continuing through the time of his original First Step application, Mr. Dunich-Kolb was confined at USP Canaan in its minimum-security satellite camp facility. Sometime thereafter, however, he was transferred to MDC, an administrative security federal transfer center,[16] where he remains. The nature of confinement is far from dispositive, but I do give it some weight in assessing the extent to which the punitive purposes of the sentence have been served.

Mr. Dunich-Kolb now points to his efforts at rehabilitation while in prison. For what it is worth, none of his lengthy submissions contain any of the conspiratorial reasoning by which he formerly sought to justify his criminal behavior. Prison records demonstrate that he has compiled an impressive record of completion of courses as part of the Release Preparation Program. These include academic and religious subjects, as well as life skills and personal growth training. Good rapport with prison authorities and regular contact with his family are reported. (*See* DE 118-6 at 1–10, 17–36, DE 123 at 3–15) These facts allay somewhat the court's concern that Mr. Dunich-Kolb's particular personality factors would make it difficult for him to conform his conduct to the law, suggesting that recidivism might be likely.

Now, as before, I do not consider Mr. Dunich-Kolb to pose a danger if released, and he has never seemingly posed a risk of flight. As I say, I believe the probability of recidivism to be reduced somewhat. His plan for reentry appears to be a practical one, in that he will resume living with his parent, for

---

[15]    The COVID-19 pandemic, with the associated lockdowns, restrictions on visitors, and so on, began in earnest shortly thereafter. MDC is at level 3, the highest level of COVID-related restrictions on prison operations. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp

[16]    Such facilities seem to be designed, not as prisons, but as holding facilities for inmates pending transfer elsewhere. Mr. Dunich-Kolb attaches newspaper accounts of a federal judge's criticism of conditions and the competency of the administration at MCC in Manhattan. One of the stories adds that the "reputation" of MDC is "not much better," citing a breakdown in the heating system in 2019. (DE 118-5 at 10) I give these newspaper accounts no great weight.

whom he will care. He will be required to find employment, however, in some field other than, and preferably very far removed from, tax return preparation. *See* Judgment at p. 4 (conditions of supervised release). (DE 104)

To avoid misunderstanding, I emphasize that the Court will not routinely revisit and reweigh the § 3553(a) factors while a prisoner is serving a sentence. The § 3553(a) factors discussed in this section are not, standing alone, a basis for compassionate release. Here, however, the Court has made the threshold finding that the mother's situation is extraordinary and compelling. That being the case, I have considered the § 3553(a) factors to determine what relief, if any, should be granted.

Ultimately, I find that more recent developments weigh against, but do not entirely erase, the very substantial bases upon which the Court based the initial 72-month sentence. I do not believe that immediate relief is appropriate, because the time served to date is not sufficient to fulfil the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Weighing all factors, however, I will reduce the sentence from 72 months to 60 months. Calculation of applicable credits and the actual release date is, as always, committed to the determination of the BOP.

## ORDER

The Court having reviewed the submissions, and for the reasons expressed in the foregoing Opinion,

IT IS this 14th day of February, 2022

ORDERED that the second motion (DE 118) of the defendant for compassionate release under the First Step Act is GRANTED IN PART. The sentence of 72 months' imprisonment is reduced to 60 months, with the actual release date to be calculated by the BOP. All other components of the sentence remain in place. The clerk shall close the file.

/s/ Kevin McNulty
_____
Kevin McNulty
U.S. District Judge